A & H SPORTSWEAR, INC;
Mainstream Swimsuits,
Inc., Appellants,

v.

VICTORIA'S SECRET STORES, INC.;
Victoria's Secret Catalogue, Inc.

Nos. 99–1734, 99–1735.

United States Court of Appeals,
Third Circuit.

Argued April 26, 2000.

Filed Dec. 1, 2000.

Arthur H. Seidel, Stephen J. Meyers (argued), Michael F. Snyder, Seidel, Gonda, Lavorgna & Monaco, Philadelphia, PA, Norman Seidel, Laub, Seidel, Cohen & Hof Eastern Dollar Savings & Trust Co. Bldg., Easton, PA, Counsel for Appellants.

Frank J. Colucci, (Argued), Richard P. Jacobson, Colucci & Umans, New York, NY, H. Robert Fiebach, Cozen & O'Connor, The Atrium, Philadelphia, PA, Counsel for Appellees.

Before BECKER, Chief Judge, BARRY and BRIGHT,* Circuit Judges.

**OPINION OF THE COURT**

I. Facts ...................................................................208

II. Procedural History .....................................................209

III. The Direct Confusion Claim .............................................210
 A. The *Lapp* Test and the District Court's Opinion ......................211
 B. The Test for Directly Competing Goods ................................212
 C. The District Court's Methodology ....................................215

IV. Review of the District Court's Analysis .................................216
 A. Similarity of the Marks .............................................216
 1. Sight, Sound, Meaning ...........................................217
 2. The Housemarks and the Disclaimer ...............................218
 3. The PTO's Rejection of Victoria' s Secret's Application .........220
 4. Summary .........................................................221
 B. Strength of the Marks ...............................................221
 1. Distinctiveness or Conceptual Strength ..........................221
 2. Commercial Strength of the Mark .................................224
 3. Summary .........................................................224
 C. Product Similarity ..................................................224
 D. Marketing and Advertising Channels ..................................225
 E. Sophistication of Consumers .........................................225
 F. The Intent of the Defendant .........................................225
 G. Actual Confusion ....................................................226
 H. Combining the Factors ...............................................227

V. The Reverse Confusion Claim .............................................227
 A. Introduction ........................................................227
 B. The Test for Reverse Confusion ......................................229
 1. The Factors that are the Same ...................................229
 2. Similarity of the Marks .........................................229
 3. Strength of the Marks ...........................................230
 a. Commercial Strength ..........................................230
 b. Distinctiveness or Conceptual Strength .......................231

* Honorable Myron H. Bright, United States Circuit Judge for the Eighth Circuit, sitting by designation.

 4. The Intent of the Defendant ........................................232
 5. Factors Relating to Actual Confusion................................233
 6. Other Relevant Facts ..............................................234
 7. Summary of the Test for Reverse Confusion ..........................234
 C. The District Court's Opinion ...........................................234
 D. Guidance for Remand ....................................................236
 1. Introduction ......................................................236
 2. Similarity of the Marks ...........................................236
 3. Strength of the Marks .............................................236
 4. Intent ............................................................237
 E. Summary ................................................................237

VI. Conclusion .................................................................238

BECKER, Chief Judge.

The critical question in this trademark infringement case, before us for the second time, is whether a typical consumer is likely to confuse MIRACLESUIT swimwear with THE MIRACLE BRA swimwear.[1] The former is a product of Plaintiff A & H Sportswear Company ("A & H"), which manufactures ten percent of all swimsuits made in the United States. The latter is a product of Defendant Victoria's Secret, the lingerie leviathan that recently entered the swimwear market. A & H filed suit in the District Court for the Eastern District of Pennsylvania claiming that The Miracle Bra swimwear mark violates the Lanham Act because it is confusingly similar to the Miraclesuit swimwear mark, which A & H registered first. A & H contends that: (1) consumers are likely to wrongly associate The Miracle Bra with A & H (the direct confusion claim[2]); or, in the alternative, (2) consumers are likely to think that Miraclesuit is a product of Victoria's Secret (the reverse confusion claim).

During an extensive bench trial, A & H argued that Victoria's Secret should be enjoined from using The Miracle Bra mark for swimwear. Finding a "possibility of confusion," the District Court granted relief to A & H. Following an appeal to this Court that clarified that likelihood of confusion (instead of possibility of confusion) was the correct standard, the District Court concluded that A & H had failed to show by a preponderance of the evidence that Victoria's Secret's The Miracle Bra swimwear mark created a likelihood of either direct or reverse confusion with the Miraclesuit product.

In *Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 463 (3d Cir.1983), this Court established a ten-factor test (the *"Lapp"* test) to determine the likelihood of confusion for direct confusion claims between goods that do *not* directly compete in the same market, but we have never decided what factors should be considered in the case of directly competing goods. The District Court therefore fashioned its own multi-factored test that approximates, but does not completely match, the *Lapp* test. In employing its test, the District Court acknowledged that the most important factor was the similarity of the marks, and determined that their overall commercial impressions were not similar.

The District Court placed particular emphasis on the fact that the The Miracle Bra mark typically appears alongside Victoria's Secret's housemark (the mark of the manufacturer), and that Victoria's Secret uses a disclaimer with its mark that explicitly states that The Miracle Bra swimwear is unrelated to Miraclesuit or A

---

**1.** We will refer to the marks in lower case throughout the remainder of the opinion.

**2.** Although we described this phenomenon as "forward confusion" in *Fisons Horticulture, Inc. v. Vigoro Industries, Inc.*, 30 F.3d 466,

479 (3d Cir.1994), we think that the term "direct confusion" is more sonorous and accurate. Products are not "forwardly confused" but "directly confused."

& H. The court also concluded that Victoria's Secret's intent, the paucity of credible incidents of actual confusion, and the sophistication of the consumers weighed in favor of Victoria's Secret, while the competitive proximity of the products and the strength of the Miraclesuit mark weighed in favor of A & H. Taking all this into account, the District Court found no likelihood of direct confusion between the marks, rejected A & H's direct confusion claim, and, on the assumption that the disclaimer would continue to be used in an effective manner, denied injunctive relief. Notwithstanding that likelihood of confusion is an issue of fact subject to deferential review, the District Court's disposition of the direct confusion claim has given rise to a number of important issues in this appeal.

A & H first contends that multi-factored tests, like the one used by the District Court, are inapplicable to competing goods, and that with directly competing goods a court should examine only the similarity of the marks. We disagree. Though a court need not look beyond the marks when goods are directly competing and the marks virtually identical, we conclude that the factors we have developed in the noncompeting goods context are helpful tools and should be used to aid in the determination of the likelihood of confusion in other cases. Our jurisprudence does not preclude this result, and the District Court did not err in taking other considerations into account.

Alternatively, A & H submits that the District Court erred as a matter of law by not following precisely the ten-factor *Lapp* test that we have previously developed to determine likelihood of confusion. It argues that by not considering certain factors that would clearly have weighed in favor of A & H, the District Court distorted the likelihood of confusion standard. We reject this argument for two reasons. First, we have developed the ten-factor *Lapp* test only as a guide. Although all of the factors can be useful, the Lanham Act

does not require that they be followed precisely so long as the relevant comparisons suggested by the test are made. More importantly, although the District Court arguably used a creative test, all of the *Lapp* factors are integrated, in one way or another, into the court's analysis. Therefore, even if the *Lapp* test were mandatory, A & H could not show prejudice.

A & H also argues that, regardless of the test to be used, the District Court clearly erred in resting its finding that there was no likelihood of confusion on Victoria Secret's disclaimer. A & H asserts that it constitutes legal error even to consider such a disclaimer, but we disagree, seeing no reason to forbid courts from considering this kind of distinguishing feature. In this case, the District Court properly weighed the disclaimer. We also reject A & H's assertion that the District Court erred in failing to give weight to the refusal of a Patent and Trademark Office ("PTO") examining attorney to register The Miracle Bra mark for swimwear because of its similarity to Miraclesuit. Where, as here, the PTO examining attorney did not consider all the relevant factors, and lacked significant information that was available to the District Court, his determination need not be given weight. In fact, one legal error that we do find weighs in Victoria's Secret's favor: The District Court erred by relying almost entirely on its classification of A & H's mark as "suggestive to arbitrary" in its determination that Miraclesuit was a conceptually strong mark deserving of a high degree of protection. In sum, we conclude that neither the District Court's fact-finding nor its balancing of factors warrants reversal, and hence we will affirm its judgment on the direct confusion claim.

As for the reverse confusion claim, A & H challenges the District Court's treatment as inadequate, and inconsistent with the method laid out in our leading reverse confusion case, *Fisons Horticulture, Inc. v. Vigoro Industries, Inc.*, 30 F.3d 466 (3d

Cir.1994). *Fisons* adopted the doctrine of reverse confusion, and used the *Lapp* factors to assess the likelihood of such confusion, with a few minor modifications. The District Court interpreted our precedents to require a two-step inquiry, engaging the *Lapp* factors only after an initial assessment that the disparity in commercial strength reached a high threshold. Because the threshold degree of commercial disparity that the court believed was required was not met, the court did not even examine whether there existed a likelihood of confusion.

After reviewing *Fisons* and our precedent, we are persuaded that the District Court erred in fashioning a two-step inquiry, and in failing to consider the *Lapp* factors as they apply to reverse confusion claims. We will demonstrate that the application of some of the factors changes in the reverse confusion context, and we conclude that, on the record before us, the judgment must be vacated with respect to the reverse confusion claim and the case remanded for further proceedings.

## I. Facts[3]

The Miraclesuit bathing suit is made by A & H, which manufactures ten percent of all swimwear in the United States. The Miraclesuit is distributed by Swim Shaper, a division of Mainstream Swimsuits. The Miraclesuit is advertised as having a slimming effect on the wearer without using uncomfortable girdle-like binds. Its material purportedly smooths out middle body bulges and works with a flattering design to confuse the eye such that the wearer is advised, in advertising and in tags that generally accompany the product, that she will "[l]ook ten pounds lighter in 10 seconds[:] The ten seconds it takes to slip it on." Miraclesuits also include tags indicating that they are Swim Shaper products.

Miraclesuits, which sell for between $50 and $100, come in both single pieces and bikinis. Many are equipped with push-up bras, shaping or underwire bras, or simple, unshaped bras. They are typically sold to trade buyers for department store sales and national mail-order catalogues, and, on two occasions, they were featured in the Victoria's Secret catalogue. A & H received a trademark registration for the mark Miraclesuit in the fall of 1992. The District Court found that A & H has spent over $1.2 million to advertise the Miraclesuit in magazines and trade papers, and has received the equivalent of $1.5 million of advertising in "free publicity," i.e., publicity in trade magazines, consumer columns, and the general press. The advertising and publicity campaign has been a success, and Miraclesuits constitute approximately ten percent of all of A & H's sales.

While A & H is busy selling skinny waists and midriffs, Victoria's Secret, the nation's premier lingerie seller, has focused on instant enlargements of the bust.[4] In 1993, Victoria's Secret released The Miracle Bra, a padded push-up bra. Victoria's Secret filed an application to register its The Miracle Bra trademark, and unleashed an avalanche of advertising and publicity, ultimately spending over $13 million on The Miracle Bra products. The campaign succeeded, and sales of The Mir-

---

3. The facts are set forth more fully in the District Court's three opinions in this case. *See A & H Sportswear Co. v. Victoria's Secret Stores, Inc.*, 926 F.Supp. 1233 (E.D.Pa.1996); *A & H Sportswear Co. v. Victoria's Secret Stores, Inc.*, 967 F.Supp. 1457 (E.D.Pa.1997) (as amended); *A & H Sportswear Co. v. Victoria's Secret Stores, Inc.*, 57 F.Supp.2d 155 (E.D.Pa.1999).

4. Victoria's Secret Stores, a Delaware corporation with headquarters in Columbus, Ohio, has over 650 stores nationwide. Victoria's Secret Catalogue, a Delaware corporation with headquarters in New York City, distributes over 300 million catalogues annually. Both companies are independent subsidiaries of Intimate Brands, Inc., owned by The Limited, Inc., which is based in London. *See A & H Sportswear Inc. v. Victoria's Secret Stores, Inc.*, 166 F.3d 197, 200 (3d Cir.1999).

acle Bra products have topped $140 million since they were first introduced.

In 1994, Victoria's Secret's trademark application for The Miracle Bra mark on lingerie was approved. Later that year, Victoria's Secret moved The Miracle Bra mark into swimwear, and The Miracle Bra swimsuit and The Miracle Bra bikini started appearing in Victoria's Secret catalogues. (The Miracle Bra lingerie and swimwear are sold only in Victoria's Secret stores and catalogues.). The cost of The Miracle Bra swimwear varies, but it is typically in the neighborhood of $70, and The Miracle Bra and Victoria's Secret tags are prominently featured on all swimwear. This product also succeeded: The total sales of The Miracle Bra swimsuits reached $28 million by summer 1997. The last critical fact regarding this swimwear is that, as a result of this litigation, Victoria's Secret has committed itself to using the following disclaimer with all promotion, advertising, and sales of The Miracle Bra: "The Miracle Bra Swimwear Collection is exclusive to Victoria's Secret and is not associated with Miraclesuit by Swimshaper."

In 1995, after this litigation began, Victoria's Secret applied to the PTO for a trademark for The Miracle Bra for swimsuits, bathing suits, and bikinis. Because it had previously conducted a search for The Miracle Bra as applied to lingerie, which had led it to the conclusion that The Miracle Bra did not threaten to infringe on other trademarks, Victoria's Secret had not conducted a separate trademark search of The Miracle Bra trademark as it applied to swimwear. However, the PTO examining attorney denied Victoria's Secret's application due to its similarity to Miraclesuit because he determined that: (1) "Miracle" was the dominant feature of each mark; and (2) the product lines overlap. The denial was not appealed.

## II. Procedural History

In December 1994, A & H filed a complaint against Victoria's Secret, alleging direct and reverse trademark infringement, unfair competition, dilution, and unjust enrichment. The District Court held a bench trial on liability in the fall of 1995, and a damages and relief trial in 1996. The court found that Victoria's Secret's use of The Miracle Bra on its lingerie created no likelihood of confusion with A & H's Miraclesuit. *See A & H Sportswear Co. v. Victoria's Secret Stores, Inc.*, 926 F.Supp. 1233, 1264 (E.D.Pa.1996) ("*A & H I*"). However, with regard to Victoria's Secret's use of The Miracle Bra mark on swimwear, the District Court found a "possibility of confusion" with A & H's Miraclesuit swimwear. *See id.* at 1269. Based upon this finding, it ordered Victoria's Secret not to use The Miracle Bra tag with swimwear unless it was accompanied by the disclaimer: "The Miracle Bra (TM) swimwear collection is exclusive to Victoria's Secret and not associated with Miraclesuit (R) by Swim Shaper (R)." *A & H Sportswear Co. v. Victoria's Secret Stores, Inc.*, 967 F.Supp. 1457, 1482 (E.D.Pa.1997) ("*A & H II*"). The District Court also ordered that royalties on past and future sales of The Miracle Bra swimsuits be paid to A & H. *See id.* at 1483. Both parties appealed. Although the District Court granted a stay of its order pending appeal, Victoria's Secret has continued to use the disclaimer voluntarily and has represented to us at oral argument that it will continue to do so regardless of the outcome of this litigation.

During the prior appeal, we heard the case en banc to consider the viability of the "possibility of confusion" standard originally used by the District Court. We rejected that standard, and remanded the case to the District Court to apply the traditional "likelihood of confusion" standard to the swimsuits' marks. *See A & H Sportswear Inc. v. Victoria's Secret Stores, Inc.*, 166 F.3d 197, 206 (3d Cir.1999) ("*A & H III*"). The bulk of the en banc opinion is devoted to explaining the rejection of the "possibility of confusion" standard. However, we also commented on what has be-

come a central question in the current appeal, namely, whether the likelihood of confusion analysis differs for competing, as opposed to noncompeting, goods:

[T]he standard to be applied when goods that are the subject of a trademark infringement claim are directly competing, as is the situation with [Miraclesuit and The Miracle Bra swimwear], is different than that applied when the goods are not competing. The ten-factor test for likelihood of confusion between marks that are not competing, derived from *Scott Paper Co.* [*v. Scott's Liquid Gold, Inc.*], 589 F.2d [1225,] 1229 [ (3d Cir. 1978) ], is not required when the goods directly compete. In fact, we have said that "where the trademark owner and the alleged infringer deal in competing goods or services, the court need rarely look beyond the mark itself".

*Id.* at 202 (quoting *Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 462 (3d Cir. 1983)). We also suggested that the District Court should, on remand, consider whether this case implicated the reverse confusion doctrine, noting the possibility that the later-entering mark of the junior user-in this case the larger, more powerful company (Victoria's Secret)-might be overwhelming the mark of the prior, or senior, user (A & H), the phenomenon typifying reverse confusion.

 Following our mandate, the District Court applied the "likelihood of confusion" test and found that there was no likelihood of direct confusion and no grounds for consideration of reverse confusion. It therefore denied the request for injunctive relief. *See A & H Sportswear Co. v. Victoria's Secret Stores, Inc.*, 57 F.Supp.2d 155, 178–79 (E.D.Pa.1999) ("*A & H IV*"). A & H appeals. We review the District Court's factual determinations for clear error, but we give plenary review to its legal conclusions. *See A & H III*, 166 F.3d at 202–03. Likelihood of confusion is a factual question, *see* id., but legal principles govern what evidence may, or must, be considered by the District Court in reaching that conclusion, and also what standards apply to its determination. We review the denial of the request for injunctive relief for abuse of discretion. See *Warner-Lambert Co. v. Breathasure, Inc.*, 204 F.3d 87, 89 n. 1 (3d Cir.2000).

## III. The Direct Confusion Claim

 We measure federal trademark infringement, 15 U.S.C. § 1114, and federal unfair competition, 15 U.S.C. § 1125(a)(1)(A), by identical standards. *See A & H III*, 166 F.3d at 202.[5] To prove either form of Lanham Act violation, a plaintiff must demonstrate that (1) it has a valid and legally protectable mark; (2) it owns the mark; and (3) the defendant's use of the mark to identify goods or services causes a likelihood of confusion. *See Commerce Nat'l Ins. Servs., Inc. v. Commerce Ins. Agency*, Inc., 214 F.3d 432, 437 (3d Cir.2000). The plaintiff bears the bur-

**5.** Section 32(1) of the Lanham Act provides: Any person who shall, without the consent of the registrant—
(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; ... shall be liable in a civil action by the registrant....
15 U.S.C. § 1114(1).
The same standard is embodied in section 43(a) of the Lanham Act, which governs unfair competition claims. That section provides, in pertinent part:

Any person who, on or in connection with any goods or services, ... uses in commerce any word, term, name, symbol, or device, ... or any false designation of origin ... which—
(A) is likely to cause confusion, or to cause mistake, or to deceive as to ... the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person ... shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.
15 U.S.C. § 1125(a)(1).

den of proof. *See American Home Prods. Corp. v. Barr Labs., Inc.*, 834 F.2d 368, 371 (3d Cir.1987). It is undisputed that A & H owns Miraclesuit, and that it is a valid and legally protectable mark. Therefore, the questions in this case involve the delineation and application of standards for the evaluation of likelihood of confusion.

## A. The *Lapp* Test and the District Court's Opinion

■■■ A likelihood of confusion exists when "consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark." *Dranoff-Perlstein Assocs. v. Sklar*, 967 F.2d 852, 862 (3d Cir.1992) (quotation marks omitted). In *Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460 (3d Cir.1983), we stated that when the goods involved in a trademark infringement action directly compete with each other, a court "need rarely look beyond the mark itself" to determine the likelihood of confusion. *Id.* at 462. For noncompeting goods, we developed a non-exhaustive list of factors to consider in determining whether there is a likelihood of confusion between marks:

(1) the degree of similarity between the owner's mark and the alleged infringing mark;

(2) the strength of the owner's mark;

(3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;

(4) the length of time the defendant has used the mark without evidence of actual confusion arising;

(5) the intent of the defendant in adopting the mark;

(6) the evidence of actual confusion;

(7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media;

(8) the extent to which the targets of the parties' sales efforts are the same;

(9) the relationship of the goods in the minds of consumers because of the similarity of function;

(10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market, or that he is likely to expand into that market.

*Id.* at 463 (citing *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225, 1229 (3d Cir.1978)). Throughout the opinion we will refer to these factors as the "*Lapp*" factors.

The District Court recognized that we have not "explicitly elucidated what kind of factors should be considered in the case of directly competing goods." *A & H IV*, 57 F.Supp.2d at 163. It chose not to use the *Lapp* test, but instead developed its own test, drawing on many of the same factors:

(1) strength of the plaintiff's mark;

(2) similarity between the marks;

(3) similarity of the products and the degree to which they directly compete with each other;

(4) marketing or advertising channels used;

(5) sophistication of consumers;

(6) defendant's intent in selecting the mark; and

(7) incidents of actual confusion.

*Id.* A & H contends that the District Court erred in three ways in applying these factors. First, it argues that when goods are directly competing, a district court need only examine the similarity of the marks. Second, it submits that inasmuch as the District Court fashioned its own test, the *Lapp* factors it omitted would have tipped the balance in favor of finding a likelihood of confusion. Third, it contends that on any test the similarity of the marks creates a likelihood of confusion.

## B. The Test for Directly Competing Goods

■ We have not previously settled upon a method that district courts should use to examine whether there exists a likelihood of confusion between directly competing goods. Uncertainty on this point in the district courts within the circuit, as demonstrated in the margin, counsels that we clarify this area of law.[6]

The multi-factored test rescribed above was developed to determine likelihood of confusion for noncompeting goods. *See Versa Prods. Co., Inc. v. Bifold Co. (Mfg.) Ltd.*, 50 F.3d 189, 202 (3d Cir.1995). This genesis is apparent in the substance of the test: factor (7) directs a court to look at the markets of the goods "though not competing"; factor (9) directs that the court examine the "similarity of function"; and factor (10) directs that the court look at "other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market, or that he is likely to expand into that market." These factors are not apposite for directly competing goods: By definition, the goods are competing, their function is the same, and the senior and junior user are already in each other's markets.

■ Nonetheless, despite the test's etiology, the raison d'etre of the *Lapp* factors and the purpose of their development was to aid in the navigation of the difficult course of determining a "likelihood of confusion." A district court should not be foreclosed from using any factors that it deems helpful in analyzing whether a likelihood of confusion exists between given products, whether or not they directly compete. *Lapp's* suggestion that, for competing goods, the court "need rarely look beyond the mark itself," *Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 462 (3d Cir.1983), may be an exercise in unjustified optimism; cases are often not easy, and courts will frequently need help in sorting out the likelihood of confusion. District courts within this circuit, as well as other appellate courts, have found that consideration of the *Lapp* factors (or their analogs from other circuits) can be quite useful for determining likelihood of confusion even when the goods compete directly. *See, e.g., Barre–National, Inc. v. Barr Labs., Inc.*, 773 F.Supp. 735, 742 (D.N.J.1991); *Banff, Ltd. v. Federated Dep't Stores, Inc.*, 841 F.2d 486, 490 (2d Cir.1988).

Further, we recognize that many of the *Lapp* factors that are specifically applicable only to noncompeting goods are often used by courts to determine, in the first instance, whether goods are or are not directly competing. This makes the plaintiff's proposed prohibition on the examination of evidence beyond the marks themselves somewhat illusory. For instance, in *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341 (9th Cir.1979), the Court of Appeals for the Ninth Circuit concluded that two lines of recreational boats were not directly competitive because they were marketed to different consumers and were de-

---

**6.** In *Capital Bonding Corp. v. ABC Bail Bonds, Inc.*, 69 F.Supp.2d 691 (E.D.Pa.1999), the court cited *Lapp* in support of its conclusion that "[b]ecause Capital and ABC deal in competing services, we need only compare the Capital image with the ABC image and determine whether the marks are confusingly similar." *Id.* at 696. In *New York Style Bagel Chip Co. v. That's Entertainment, Inc.*, No. 90–7759, 1992 WL 46854 (E.D.Pa. Mar.9, 1992), the court followed the statement in *Lapp* that the court need not look beyond the marks in deter-mining likelihood of confusion if they are directly competing, *see id.* at *9, but held that the *Lapp* factors could be used when relevant and helpful, *see id.* at *13. In *Barnes Group, Inc. v. Connell Ltd. Partnership*, 793 F.Supp. 1277, 1300 (D.Del.1992), however, the court used all of the *Lapp* factors for competing goods without a discussion of whether such a use was appropriate. Likewise, in *ICON Solutions, Inc. v. IKON Office Solutions, Inc.*, No. 97–4178, 1998 WL 314672 (E.D.Pa. June 15, 1998), the court used four *Lapp* factors, noting that the *Lapp* factors can be used in directly competing cases although developed for noncompeting goods. *See id.* at *6–*7; *see also W.L. Gore & Assocs., Inc. v. Johnson & Johnson*, 882 F.Supp. 1454, 1457–60 (D.Del.1995) (using some *Lapp* factors in determining that a preliminary injunction was not required).

signed for different uses. *See id.* at 348. This inquiry approximates *Lapp* factors (8) and (9), which look to the different functions of the products and the different target customers. Similarly, in *Induct-O-Matic Corp. v. Inductotherm Corp.*, 747 F.2d 358 (6th Cir.1984), the court affirmed a district court's conclusion that the parties were direct competitors based on an examination of the similarity of the parties' customer base, geographical trading area, and products, *see id.* at 362, factors which approximate *Lapp* factors (7), (8), and (9). Indeed, in *A & H I*, the District Court first applied the *Lapp* test in analyzing A & H's infringement claim regarding the use of The Miracle Bra mark on lingerie, and then observed that much of the same analysis could be used to determine whether The Miracle Bra swimsuit and the Miraclesuit shared the same market. *See id.* at 1266.[7]

The above observations lead us to conclude that the *Lapp* factors should be used both for competing and for noncompeting goods. As for those factors that specifically refer to noncompeting goods, we believe that, rather than force courts first to inquire as to whether or not the goods are directly competitive simply for the purpose of determining if those factors apply—and, presumably, applying *Lapp* factors to make this initial determination—factors (7), (9), and (10) of the *Lapp* test must be adapted to make them applicable whether the products directly compete or not.

In holding that the *Lapp* test is to be employed when examining both competing and noncompeting goods, we acknowledge that we have at times suggested that the method for comparing competing goods is different from that for noncompeting goods. In *Williamson–Dickie Manufacturing Co. v. Davis Manufacturing Co.*, 251 F.2d 924 (3d Cir.1958), for example, we did not look beyond the marks themselves in upholding a trial court's determination that the marks "Dickie Davis" and "Dickie's" for boys' clothing were confusingly similar. *See id.* at 926–27. Furthermore, in *Lapp* we stated that

> [w]here the trademark owner and the alleged infringer deal in competing goods or services, the court need rarely look beyond the mark itself. In those cases the court will generally examine the registered mark, determine whether it is inherently distinctive or has acquired sufficient secondary meaning to make it distinctive, and compare it against the challenged mark.

721 F.2d at 462 (emphasis added). Additionally, in *Fisons*, we noted that the

> showing of proof plaintiff must make for[likelihood of confusion] depends on whether the goods or services offered by the trademark owner and the alleged infringer are in direct competition.... Where the goods or services are not competing, the similarity of the marks is only one of a number of factors the court must examine to determine likelihood of confusion.

30 F.3d at 472–73. Finally, in *A & H III*, we stated that "the standard to be applied when goods ... are directly competing ... is different than that applied when the goods are not competing." 166 F.3d at

---

7. Courts have also occasionally borrowed from antitrust law's definition of "relevant market" and "submarket" to determine whether goods are directly competitive for the purpose of unfair competition claims. *See, e.g., Sara Lee Corp. v. Kayser–Rot Corp.*, 1994 U.S. Dist. LEXIS 19198, at *98 (M.D.N.C. Oct. 13, 1994); *Worthington Foods, Inc. v. Kellogg Co.*, 732 F.Supp. 1417, 1436 (S.D.Ohio 1990); *cf. A & H I*, 926 F.Supp. at 1267 (citing to an antitrust case in its inquiry as to whether The Miracle Bra swimwear and Miraclesuit competed in the same market).

In *Brown Shoe Co., Inc. v. United States*, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962), the Supreme Court explained that products may belong to distinct "submarkets," which may be determined by reference to, *inter alia*, the functions of the products, whether the products are marketed to different consumers via different vendors, and whether the public understands the submarkets to be "separate economic entit[ies]." *Id.* at 325. These factors for discovering the presence of competition in the antitrust realm also track *Lapp* factors (7) through (10).

202. In each of these cases, we arguably implied that when the goods are competing, the similarity of the marks is the only relevant factor.

Nonetheless, we read our prior opinions on this subject to counsel only that a district court may, if it so chooses, examine only mark similarity for directly competing goods.

A & H urges us to take the quoted statement from *A & H III* to mean that a district court should not consider any factors at all beyond the similarity of the marks themselves. However, we believe that the word "standard" is different from the word "test." The better reading of this statement is the literal one: The "standard" for deter mining when marks are likely to be confused is different when the marks directly compete, i.e., the factor regarding the similarity of marks may increase in importance, but it does not eliminate the other factors entirely. This proposition is not only unremarkable, it flows naturally from the *Lapp* test, which considers the competition and potential competition of the products in the marketplace. We have certainly never held that a court *may not* look beyond the marks themselves to determine likelihood of confusion. The quote from *Lapp* itself, rescribed in our prior opinion in this case ("the court need rarely look beyond the mark itself") presumes that a court might sometimes need to look beyond the mark. *Lapp*, 721 F.2d at 462.

We think that this inference is a sound one, for there appears to be no reason, statutory or otherwise, to impose the restrictive rule proposed by A & H. Indeed, the cases relied upon by A & H do no more than suggest that the *Lapp* inquiry may be unnecessary in some directly competing goods cases. *See, e.g., A & H III*, 166 F.3d at 202 (holding that in directly competing goods cases, the multi-factored test "is not required"). At all events, because we have never before been confronted with this question, any implication in our prior cases that courts are foreclosed from looking beyond mark similarity for competing goods would have been dictum.

Our conclusion that the *Lapp* factors may be used to determine the likelihood of confusion in cases of directly competing goods, at least when the marks are *not* identical, accords with the approaches of the Second, Sixth, Eighth, and Ninth Circuits, which also have approved using multi-factored tests, developed for noncompetitive goods, in the competitive goods arena. *See Banff, Ltd. v. Federated Dep't Stores, Inc.*, 841 F.2d 486, 490 (2d Cir.1988); *Jet, Inc. v. Sewage Aeration Sys.*, 165 F.3d 419, 421–22 (6th Cir.1999); *Duluth News-Tribune v. Mesabi Publ'g Co.*, 84 F.3d 1093, 1096 (8th Cir.1996); *Dr. Seuss Enters., L.P. v. Penguin Books U.S.A., Inc.*, 109 F.3d 1394, 1404 (9th Cir.1997).

■ As explained above, we do not hold that a District Court *must* use the factors. In fact our precedents suggest the opposite. If products are directly competing, and the marks are clearly very similar, a district judge should feel free to consider only the similarity of the marks themselves. *See, e.g., Opticians Ass'n of Am. v. Independent Opticians of Am.*, 920 F.2d 187, 195 (3d Cir.1990) ("[v]ery little analysis" was necessary in a case where a splinter group of a larger organization continued to use the organization's collective mark). Moreover, the court often need not apply each and every factor; when goods are directly competing, both precedent and common sense counsel that the similarity of the marks takes on great prominence.[8] At all events, the factors are meant to be tools, not hurdles. On the other hand, when, as in this case, the degree of confusing similarity of the marks is not clear, *see Barre National, Inc.*, 773 F.Supp. at 742, a court can turn to the other factors. Here, the District Court

8. Although a district court may reasonably decide that certain of the *Lapp* factors are inapplicable or unhelpful in a particular case, we do counsel that, to facilitate review, the court explain its choice not to employ those factors.

did not err in choosing to look beyond the marks themselves.

■ To summarize, we hold that whether or not the goods directly compete, the *Lapp* factors should be employed to test for likelihood of confusion. Therefore, likelihood of confusion for both competing and noncompeting goods should be tested with reference to the following:

(1) the degree of similarity between the owner's mark and the alleged infringing mark;

(2) the strength of the owner's mark;

(3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;

(4) the length of time the defendant has used the mark without evidence of actual confusion arising;

(5) the intent of the defendant in adopting the mark;

(6) the evidence of actual confusion;

(7) whether the goods, competing or not competing, are marketed through the same channels of trade and advertised through the same media;

(8) the extent to which the targets of the parties' sales efforts are the same;

(9) the relationship of the goods in the minds of consumers, whether because of the near-identity of the products, the similarity of function, or other factors;

(10) other facts suggesting that the consuming public might expect the prior owner to manufacture both products, or expect the prior owner to manufacture a product in the defendant's market, or expect that the prior owner is likely to expand into the defendant's market.

As we stress further below, the *Lapp* test is a qualitative inquiry. Not all factors will be relevant in all cases; further, the different factors may properly be accorded different weights depending on the particular factual setting. A district court should utilize the factors that seem appropriate to a given situation.

## C. The District Court's Methodology

■ A & H argues in the alternative that inasmuch as the District Court used a multi-factored test, it should have considered *all* of the *Lapp* factors, and that the "missing" factors would have favored A & H. It therefore contends that the court erred as a matter of law in fashioning its own test. However, the test used by the District Court is functionally the same as the *Lapp* test. A comparison of these factor lists reveals that the ostensibly missing *Lapp* factors appear to be incorporated into the District Court's test. *Lapp* factor (9), "the relationship of the goods in the minds of consumers, whether because of the near-identity of the products, the similarity of function, or other factors" and *Lapp* factor (8), "the extent to which the targets of the parties' sales efforts are the same," are subsumed in the court's factor (3), which considers the "similarity of the products and the degree to which they directly compete with each other." *Lapp* factor (4), "the length of time the defendant has used the mark without evidence of actual confusion" is subsumed along with factor (6), "evidence of actual confusion," within the District Court's factor (7), "incidents of actual confusion." *Lapp* factor (10), "other facts suggesting that the consuming public might expect the prior owner to manufacture both products, or expect the prior owner to manufacture a product in the defendant's market, or expect that the prior owner is likely to expand into the defendant's market," is unmentioned, but also unnecessary, because the similarity of the goods and their competitive relationship was accounted for in the court's factor (3).

A & H essentially argues that, had the *Lapp* test been applied as written, a greater absolute number of factors would have been decided in its favor, thus leading to a different outcome; for instance, the court's factor (3), rather than counting in its favor a single time, would have been divided into at least two factors, each of which would have weighed in its favor. However, we

have repeatedly insisted that the *Lapp* factors are not to be mechanically tallied, but rather that they are tools to guide a qualitative decision. *See Fisons*, 30 F.3d at 476 n. 11 ("The weight given to each factor in the overall picture, as well as its weighing for plaintiff or defendant, must be done on an individual fact-specific basis.").

The District Court did not engage in a simplistic quantitative comparison, but accurately understood the role of the factors:

No single factor is dispositive, and a finding of a likelihood of confusion does not require a positive finding on a majority of these factors. Instead, they are simply a guide to help determine whether confusion would be likely between the use of two contested trademarks on competing products. In addition to the listed factors, a court is free to consider other relevant factors in determining whether a likelihood of confusion exists.

*A & H IV*, 57 F.Supp.2d at 164 (citations omitted). Although it might promote clarity always to use the same factors in the same order, the District Court covered all the ground covered by the *Lapp* factors and did so with care. Therefore, we conclude, the court did not err in its use of the factors.

## IV. Review of the District Court's Analysis

Because we hold that the District Court's methodology was functionally similar to the *Lapp* test, we will review the court's decision on its own terms; i.e., using the multi-factored test that the District Court created. In the future, however, for the sake of consistency, district courts should employ the formulation of the test for confusion as set forth in *Lapp* and in Part III.B, *supra*.

### A. Similarity of the Marks

 The single most important factor in determining likelihood of confusion is mark similarity. *See Fisons*, 30 F.3d at

476. The test for such similarity is " 'whether the labels create the same overall impression when viewed separately.' " *Id.* (quoting *Banff, Ltd. v. Federated Dep't Stores, Inc.*, 841 F.2d 486, 492 (2d Cir. 1988)). Marks "are confusingly similar if ordinary consumers would likely conclude that [the two products] share a common source, affiliation, connection or sponsorship." *Id.* Side-by-side comparison of the two marks is not the proper method for analysis when the products are not usually sold in such a fashion. Instead, an effort must be made to move into the mind of the roving consumer. *See Ciba–Geigy Corp. v. Bolar Pharm. Co., Inc.*, 747 F.2d 844, 851 (3d Cir.1984) (affirming a district court's conclusion that, in the trade dress context, "[r]ealistically, the likelihood of confusion cannot be assessed by a side-by-side comparison of the plaintiff's and defendant's products. It is the overall physical appearance of defendant's trade dress which is critical"); 3 J. McCarthy, *Trademarks and Unfair Competition* § 23:59, at 23–162 (4th ed. 2000) ("The law does not require that the reasonably prudent purchaser keep a handy file of photographs and labels which he or she must pull out to compare with the label of every product purchased.").

The District Court acknowledged this principle, recognizing that "side-by-side comparison of the conflicting marks is improper if that is not the way buyers see the products in the market." *A & H IV*, 57 F.Supp.2d at 167–68. However, the general rule that marks should be viewed in their entirety does not undermine the common-sense precept that the more forceful and distinctive aspects of a mark should be given more weight, and the other aspects less weight. *See Country Floors, Inc. v. Partnership of Gepner and Ford*, 930 F.2d 1056, 1065 (3d Cir.1991) ("When the dominant portions of the two marks ar e the same, confusion is likely."). Applying these principles, the court looked at the sight, sound, and meaning of the marks, and considered the effect of the

housemarks and Victoria's Secret's disclaimer.

### 1. Sight, Sound, Meaning

■ The District Court closely examined the sight, sound, and meaning of the competing marks and concluded that, purely on the aesthetic level, the marks alone are "somewhat distinct." *A & H IV*, 57 F.Supp.2d at 167. Considering the sound of the marks, it noted that although they share the term MIRACLE, there are different numbers of syllables, and the last syllable of each is different. Moreover, Miraclesuit bleeds two words together while The Miracle Bra consists of three discrete words. In short, the District Court concluded that the two marks sound different. We agree. The court also properly noted that in previous cases, where courts had found a likelihood of confusion based on sound, a closer phonetic similarity was often present. *See id.* (citing *Bell Publ'g Corp. v. Bantam Doubleday Dell Publ'g Group*, 17 U.S.P.Q.2d 1634, 1637 (E.D.Pa.1990) ("*Dell*" and "*Bell*"); *Pocono Rubber Cloth Co. v. J.A. Livingston, Inc.*, 79 F.2d 446, 448 (3d Cir. 1935) ("swavelle" and "swavel")).

The District Court recognized that other, less similar-sounding marks had been found to be confusingly similar, as in *Williamson–Dickie Manufacturing Co. v. Davis Manufacturing Co.*, 251 F.2d 924, 926–27 (3d Cir.1958), where the court upheld the trial court's determination that the marks "Dickie Davis" and "Dickie's" were confusingly similar. However, it concluded that these cases could be distinguished because the presentations of the Miraclesuit and The Miracle Bra marks were sufficiently different to create an overall impression that was not confusingly similar, especially in light of Victoria's Secret's disclaimer and the use of the housemarks, as discussed *infra* Section IV.A.2.

Turning to the visual difference, the court noted that Miraclesuit is often accompanied by the "Look ten pounds lighter in ten seconds!" slogan, in various incarnations. Moreover, the court observed that:

> The Miracle Bra is presented in either all capital block letters or in small capital letters with the letters, T, M, B alone in upper capital letters, while the Miraclesuit has sometimes been advertised with the initial letter M capitalized and the rest of the mark in lower-case letters in italicized script or as one word with both the M and S capitalized.

*A & H IV*, 57 F.Supp.2d at 167. The court also determined that the meaning of the two marks was slightly different, as the descriptive word "bra" focused attention on the brassiere portion of the Victoria's Secret product, rather than on the entire suit. *See A & H IV*, 57 F.Supp.2d at 166–67 (stating that the term "bra" distinguishes the Victoria's Secret product because it "identifies the particular feature of the garment where the 'miracle' is manifested"). This conclusion accords with the District Court's finding in *A & H I*, which was upheld on appeal. *See A & H Sportswear Inc. v. Victoria's Secret Stores, Inc.*, 166 F.3d 191, 195 (3d Cir. 1999) ("[D]escriptive terms (such as 'bra' and 'suit') must be considered in assessing infringement.").

Taking all of these elements into account, the District Court concluded that, without consideration of the role of the housemark and the disclaimer, "the Miraclesuit mark and The Miracle Bra mark are somewhat distinct in sight, sound and meaning." *A & H IV*, 57 F.Supp.2d at 168. A & H challenges this analysis. It begins by asserting that, because the dominant portion of each mark is the word "Miracle," and the other words in each mark are generic (bra, swimwear, suit, the), the marks must be deemed confusingly similar. It grounds this analysis on *Country Floors, Inc. v. Partnership of Gepner and Ford*, 930 F.2d 1056 (3d Cir. 1991), in which we noted that it was relevant for purposes of comparison whether, in registering two marks, the PTO required certain descriptive elements of the

mark to be disclaimed. Comparing "Country Tiles" and "Country Floors," we held that because "floors" and "tiles" were discounted as generic in the application to the PTO, "the use of the word 'Country' by the Partnership is a material, although not necessarily a controlling, consideration on the Corporation's claim that 'Country Tiles' logo directly infringed on the Corporation's federal trademark." *Id.* at 1065.

According to A & H, the same logic dictates that these marks are likely to be confused. Not only is the dominant portion of each mark "MIRACLE," but the PTO examining attorney discounted the word "bra" in Victoria's Secret's PTO application to use The Miracle Bra for swimwear. Furthermore, A & H notes that in *Fisons,* in which "Fairway" and "Fairway Green" were up against each other, we took the district court to task for focusing too heavily on the differences between the marks instead of analyzing the overall impression. There, we held that "a subsequent user may not avoid likely confusion by appropriating another's entire mark and adding descriptive or non-descriptive matter to it." *Id.* at 477 (quoting 2 J. McCarthy, *Trademarks and Unfair Competition* § 23:15[8], at 23–102 (3d ed.1992)).

We agree with A & H that the words "the" and "bra" and "suit" are not particularly potent, but none of our cases has suggested a per se rule about the impact of generic terms within a nongeneric trademark; ultimately, the weight to be given each word is a judgment call, best suited to the fact-finder. Although the District Court might well have been more emphatic in stating its ultimate conclusions on this score, in our view, the court did not

err, much less clearly err, in finding that the sight and sound were distinct, despite the fact that the differences involve generic elements.[9]

## 2. The Housemarks and the Disclaimer

■ Having found the marks only "somewhat distinct," the District Court further concluded that Victoria's Secret's use of its housemark and disclaimer renders the marks dissimilar.[10] As the District Court recognized, affixing a well-known housemark like that of Victoria's Secret can help diminish the likelihood of confusion. *See A & H IV,* 57 F.Supp.2d at 168. We have previously acknowledged the importance of housemarks in comparing the "overall impression" of two marks. *A & H Sportswear Inc. v. Victoria's Secret Stores, Inc.,* 166 F.3d 191, 195 (3d Cir. 1999). In one of our previous decisions, we noted the relevance of the fact that both The Miracle Bra and Miraclesuit were sold with housemarks. *See id.*

■ Although A & H contends that Victoria's Secret's housemark should not have been a part of the similarity of marks analysis, the consideration of the effect of such marks has wide support in the case law. "Use of a strong, well-known mark as a part of a composite name reduces the likelihood that the remainder of the composite name will create a commercial impression distinct from that mark." *Four Seasons Hotels Ltd. v. Koury Corp.,* 776 F.Supp. 240, 247 (E.D.N.C.1991); *see also W.W.W. Pharm. Co., Inc. v. Gillette Co.,* 984 F.2d 567, 573 (2d Cir.1993) ("[W]hen a similar mark is used in conjunction with a company name, the likelihood of confusion

9. A & H also argues that all the cases cited by the District Court concern generic or descriptive marks, and not the "highly protectable" mark of Miraclesuit. However, as we discuss below in Part IV.B.1, the level of protectability is a factor discrete from mark strength in "likelihood of confusion" analysis, and it is debatable whether A & H's mark even qualifies for a "high" degree of protection conceptually. Further, A & H has presented no

support for its contention that the analysis of mark similarity in a case involving generic marks is not relevant precedent for the similarity of marks analysis in a case involving highly protected marks.

10. The court also observed in a footnote that A & H's use of its own housemark helps render the marks dissimilar. *See A & H IV,* 57 F.Supp.2d at 168 n. 17.

may be lessened."); *Astra Pharm. Prods, Inc. v. Beckman Instruments, Inc.*, 718 F.2d 1201, 1205 (1st Cir.1983) ("[O]therwise similar marks are not likely to be confused where used in conjunction with the clearly displayed name and/or logo of the manufacturer."); *Henri's Food Prods. Co., Inc. v. Kraft, Inc.*, 717 F.2d 352, 355–56 (7th Cir.1983) ("Yet even Kraft agrees that a prominent housemark may also tend to lessen confusion."). *But see Frehling Enters., Inc. v. International Select Group, Inc.*, 192 F.3d 1330, 1337–38 (11th Cir.1999) (adding brand name did not lessen likelihood of confusion for marks of otherwise "striking similarity"); *A.J. Canfield Co. v. Vess Beverages, Inc.*, 612 F.Supp. 1081, 1091 (N.D.Ill.1985) ("Vess's use of its own VESS housemark in conjunction with Chocolate Fudge is not a defense to Canfield's infringement claim, for the use of another's trademark constitutes infringement with or without the use of the infringer's housemark."), *aff'd*, 796 F.2d 903 (7th Cir.1986).

Furthermore, and most importantly, the District Court concluded that the disclaimer used by Victoria's Secret "create[d] a distinction" between the two marks. Therefore, it held that there was no similarity "solely *based on the presumption* that Defendants will continue to use the disclaimer when marketing The Miracle Bra swimwear." *A & H IV*, 57 F.Supp.2d at 169. The court grounded its finding on the fact that

> [a]lthough the positioning varied, the disclaimer often appeared in dark, black type against a light background at the lower left corner of the actual page on which The Miracle Bra Swimwear Collection was featured in the catalog, just above the telephone number for placing an order. The President of VS Catalogue stated that since there are only a few seconds in which to capture a con-

sumer's attention, placement near the telephone number is particularly appropriate.

*Id.* (citations omitted). The disclaimer, the court concluded, tips the balance and makes it unlikely that consumers will be confused by the marks themselves.[11]

A & H argues that disclaimers cannot be considered when determining likelihood of confusion, relying heavily on *United States Jaycees v. Philadelphia Jaycees*, 639 F.2d 134, 142 (3d Cir.1981), in which we held that an injunction requiring an infringing organization to add the word "Philadelphia" to its use of the word "Jaycees" was too narrow a remedy for a Lanham Act violation. However, *Jaycees* does not control for two reasons. First, the addition of a geographical term, unlike the use of a housemark, is unlikely to vitiate confusion, as one could easily conclude that the Philadelphia Jaycees was a subgroup of the larger national organization. In this case, the contest is not between Miraclesuit and Philadelphia Miraclesuit, a situation that would probably cause confusion, but rather is between two different names, one of which has a prominent disclaimer highlighting the difference. Second, our decision in *Jaycees* addressed the propriety of a *remedy*, and was premised on a finding of a Lanham Act violation, whereas in this case, we analyze the disclaimer and housemark to determine whether there was any violation at all.

In sum, the District Court committed no legal err or in considering the disclaimer. We are also satisfied that the District Court committed no factual error in concluding that Victoria's Secret's disclaimer helped to dispel potential consumer confusion between the Miraclesuit and The Miracle Bra swimwear.

11. We consider Victoria's Secret legally bound to continue the disclaimer practice, as counsel for Victoria's Secret stated in oral argument that it intends to do. It would be well advised to continue to place the disclaim-er near to the telephone number in the catalogue. We judicially notice the fact that, in one recent catalogue, the disclaimer was not so near the telephone number, a lapse that is potentially problematic.

### 3. The PTO's Rejection of Victoria's Secret's Application

■ Finally, A & H argues that the District Court erred in failing to give weight to the fact that the PTO attorney rejected Victoria's Secret's application to register The Miracle Bra for "swimsuits, bathing suits and bikinis" on the ground that there was a likelihood of confusion between its mark and Miraclesuit.[12] A & H does not argue that a PTO determination is controlling, but rather that it is important evidence that should be given considerable weight.[13]

There is some jurisprudence, although not in Third Circuit case law, suggesting that a PTO determination that marks are likely to be confused should be given weight as a matter of law. *See, e.g., Guardian Life Ins. Co. of Am. v. American Guardian Life Assur. Co.*, 943 F.Supp. 509, 523 (E.D.Pa.1996) ("While not dispositive of the issue of likelihood of confusion, the PTO's refusal to register Defendant's marks is entitled to substantial consideration by this Court."); *Driving Force, Inc. v. Manpower, Inc.*, 498 F.Supp. 21, 25 (E.D.Pa.1980) (same); *Syntex Labs., Inc.*

*v. Norwich Pharm. Co.*, 437 F.2d 566, 569 (2d Cir.1971) (refusal of Patent Office to register a mark is "entitled to great weight").

On the other hand, the Ninth Circuit has held that a preliminary determination by a low-level PTO administrator should not be accorded much weight, especially where the PTO officer did not have access to the full panoply of information that might inform a likelihood-of-confusion analysis. *See Carter–Wallace, Inc. v. Procter & Gamble Co.*, 434 F.2d 794, 802 (9th Cir. 1970). The court explained:

> Any such determination made by the Patent Office under the circumstances just noted must be regarded as inconclusive since made at its lowest administrative level. . . . The determination by the Patent Office is rendered less persuasive still by the fact that the Patent Office did not have before it the great mass of evidence which the parties have since presented to both the District Court and this court in support of their claims.

*Id.* (citation omitted). Moreover, other courts have held that a court need not

---

12. A & H also argues that the District Court did not even consider the effect of the PTO attorney's denial. This is incorrect; in its discussion of Victoria's Secret's intent, the court acknowledged that the PTO had rejected Victoria's Secret's application, but concluded that such a rejection was not dispositive. *See A & H IV*, 57 F.Supp.2d at 173 n. 26.

13. The application denial reads in relevant part (with several citations omitted):

 A. *Similarity of the Marks*
 . . .
 The registrant's mark is Miraclesuit. The SUIT portion of the mark is descriptive of the type of clothing, in this case, swimsuits. The dominant part of the registered mark is MIRACLE. The dominant part of the applicant's mark is MIRACLE. These dominant parts are identical. When the applicant's mark is compared to a registered mark, "the points of similarity are of greater importance than the points of difference." While the examining attorney cannot ignore a disclaimed portion of a mark and must view marks in their entireties, one feature of a mark may be more significant in creat-

ing a commercial impression. Disclaimed matter is typically less significant or less dominant. The addition of generic wording such as BRA does not make the mark less similar to the registered mark (see below for disclaimer requirement).

B. *Similarity of the Goods*
If the marks of the respective parties are identical or highly similar, the examining attorney must consider the commercial relationship between the goods or services of the respective parties carefully to determine whether there is a likelihood of confusion. The applicant seeks to register its mark for goods in international class 25 for "swimsuits, bathing suits and bikinis." Registrant's goods are also under international class 25 for "swimwear." The applicant's goods include the same goods as the registrants; swimsuits, bathing suits and bikinis are types of swimwear. Because of the confusing similarity between the registrant's mark Miraclesuit and the applicant's mark The Miracle Bra and the identical class and nature of the goods the, [sic] applicant's mark would cause consumer confusion as to the source of goods.

defer to the patent office when there is relevant evidence not considered by the office that informs the analysis. *See, e.g., Marketing Displays, Inc. v. Traffix Devices, Inc.,* 200 F.3d 929, 934 (6th Cir. 1999).

█ We find *Carter–Wallace* and *Marketing Displays* persuasive, and conclude that, although an initial PTO determination by an examining attorney may be considered, it need not be given weight when the PTO attorney did not review all the evidence available to the District Court. In *A & H I,* 926 F.Supp. at 1255, the District Court concluded that even a preliminary PTO determination should be given "substantial weight," but it gave no weight to the PTO's decision in its most recent opinion. It was not clear error to refuse to do so. As in *Carter–Wallace,* the PTO in this case was making a low-level preliminary determination, and did not have the benefit of the complete record before the District Court. Furthermore, the PTO attorney's decision was conclusory, not searching or analytical. *See* note 9, *supra.* Although we prefer to avoid conflicts with the PTO, we do not think that such a decision needed to receive deference here, where the District Court's conclusion that the marks were not confusingly similar relied upon the housemarks and Victoria's Secret's disclaimer, matters apparently not considered by the examining attorney.

#### 4. Summary

In sum, we conclude that the District Court did not clearly err in concluding that the marks themselves were not confusingly similar, considering their overall commercial impression, and did not make an error of law in choosing to consider Victoria's Secret's housemark and the disclaimer, or in refusing to give weight to the decision of the PTO attorney.

**14.** The examples are culled from *A.J. Canfield Co. v. Honickman,* 808 F.2d 291 (3d Cir. 1986), *Security Center, Ltd. v. First National Security Centers,* 750 F.2d 1295 (5th Cir.

### B. Strength of the Marks

█ With respect to *Lapp* factor (2), "the strength of the owner's mark," the District Court applied the *Fisons* test, which measures mark strength by "(1) the distinctiveness or conceptual strength of the mark; and (2) the commercial strength or marketplace recognition of the mark." *A & H IV,* 57 F.Supp.2d at 164. The first prong of this test looks to the inherent features of the mark; the second looks to factual evidence of "marketplace recognition." *See Fisons,* 30 F.3d at 479. The District Court concluded that the mark Miraclesuit ranged "conceptually" from suggestive to arbitrary, and that evidence of A & H's advertising expenditures demonstrated that Miraclesuit had commercial strength, as well. Level of distinctiveness and mark strength are factual determinations that we review for clear error, *see Ford Motor Co. v. Summit Motor Prods., Inc.,* 930 F.2d 277, 292 n. 18 (3d Cir.1991), but our review of legal conclusions is plenary.

#### 1. Distinctiveness or Conceptual Strength

█ In order to determine whether a mark is protectable as a trademark, marks are divided into four classifications: (1) generic (such as "DIET CHOCOLATE FUDGE SODA"); (2) descriptive (such as "SECURITY CENTER"); (3) suggestive (such as "COPPERTONE"); and (4) arbitrary or fanciful (such as "KODAK"). *See Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 768, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992).[14] Arbitrary or fanciful marks use terms that neither describe nor suggest anything about the product; they "bear no logical or suggestive relation to the actual characteristics of the goods." *A.J. Canfield,* 808 F.2d at 296 (citation omitted). Suggestive marks require con-

1985), *Douglas Labs. Corp. v. Copper Tan, Inc.,* 210 F.2d 453 (2d Cir.1954), and *Wal-Mart Stores, Inc. v. Samara Bros.,* 529 U.S. 205, 120 S.Ct. 1339, 146 L.Ed.2d 182 (2000).

sumer "imagination, thought, or perception" to determine what the product is. *Id.* at 297. Descriptive terms "forthwith convey[ ] an immediate idea of the ingredients, qualities or characteristics of the goods." *Id.* Generic marks are those that "function as the common descriptive name of a product class." *Id.* at 296. In order to qualify for Lanham Act protection, a mark must either be suggestive, arbitrary, or fanciful, or must be descriptive with a demonstration of secondary meaning. *See id.* at 297. Generic marks receive no protection; indeed, they are not "trademarks" at all. *See id.* at 305.

■ Under the Lanham Act, stronger marks receive greater protection. *See, e.g., Versa Prods. Co., Inc. v. Bifold Co. (Mfg.) Ltd.,* 50 F.3d 189, 203 (3d Cir.1995) (observing that stronger marks carry greater recognition, and that therefore a similar mark is more likely to cause confusion). Although the conceptual strength of a mark is often associated with the particular category of "distinctiveness" into which a mark falls (i.e., arbitrary, suggestive, or descriptive), that is not the only measure of conceptual strength. This is because the classification system's primary purpose is to determine whether the mark is protectable as a trademark in the first place—that is, to determine whether consumers are likely to perceive the mark as a signifier of origin, rather than as a mere identification of the type of product. *See A.J. Canfield,* 808 F.2d at 296; *Banff, Ltd. v. Federated Dep't Stores, Inc.,* 841 F.2d 486, 489 (2d Cir.1988). The classification of a mark as arbitrary, suggestive, or descriptive is only secondarily used to determine the degree of protection a mark should receive once protectability has been established. These two inquiries—whether a mark is, in fact, a trademark, versus how much protection the mark should receive—are often identical, but they do not have to be. *See Plus Prods. v. Plus Discount Foods, Inc.,* 722 F.2d 999, 1005 (2d

Cir.1983) ("Although this classification system is a helpful tool [for determining strength] . . . it is not determinative. . . .").

■ Suggestive or arbitrary marks may, in fact, be "weak" marks, particularly if they are used in connection with a number of different products. For instance, in *H. Lubovsky, Inc. v. Esprit de Corp.,* 627 F.Supp. 483 (S.D.N.Y.1986), the court concluded that the mark "Esprit," though suggestive, was, in fact, a "weak" mark. *See id.* at 487. Similarly, common marks like "Arrow," though certainly not particularly descriptive of the underlying product, have been held to be "weak" marks. *See Arrow Distilleries, Inc. v. Globe Brewing Co.,* 117 F.2d 347, 351 (4th Cir.1941). "Self-laudatory" marks like "Sure," *see Procter & Gamble Co. v. Johnson & Johnson, Inc.,* 485 F.Supp. 1185, 1196 (S.D.N.Y.1980), "Super Duper," *see S.M. Flickinger Co., Inc. v. Beatrice Foods Co.,* 174 U.S.P.Q. 51, 56 (T.T.A.B.1972), "Plus," *see Plus Prods.,* 722 F.2d at 1005, or, in this case, "Miracle," are generally held to be weak marks. *See* 2 McCarthy, *supra,* § 11:81, at 11–146 to 147.[15] Thus, the classification of a mark as "descriptive" or "arbitrary" for the purpose of determining whether it receives trademark protection at all—though a useful guide in assessing the strength or weakness of a mark—is not dispositive. *See Express Servs., Inc. v. Careers Express Staffing Servs.,* 176 F.3d 183, 186 (3d Cir.1999) (observing that classification of distinctiveness is "useful" in determining conceptual strength (citing *Banff, Ltd.,* 841 F.2d at 491)).

The District Court originally determined that the MIRACLE part of Miraclesuit was fanciful because it does not describe or reveal anything about the product. However, the court believed that the SUIT part was generic because it merely describes the qualities of the product. In sum, taking the mark's parts together, the court concluded that Miraclesuit "ranges

---

**15.** In fact, McCarthy observes that courts often hold self-laudatory marks to be descriptive. *See* McCarthy, *supra,* § 11:17, at 11–22 to 24.

from suggestive to arbitrary" because it requires some consumer imagination to determine its meaning, and therefore that the mark should receive the highest level of protection. *A & H IV*, 57 F.Supp.2d at 165.

For reasons we will presently explain, we conclude that the District Court's categorization of the Miraclesuit mark was clearly erroneous, and that the term Miraclesuit does not rise to the arbitrary level but is, at best, merely suggestive. Further, we believe that the Court erred as a matter of law in holding that its categorization of the mark was dispositive of the inquiry into the mark's strength. Because both of these conclusions were relevant to the District Court's determination that the mark was entitled to a high level of protection, we review each separately.

■ The District Court concluded that the Miraclesuit mark ranged from "suggestive to arbitrary" because it believed that the word MIRACLE did not reveal anything about the product. To the contrary, we believe that both parts of the mark describe or suggest something about the product: The word "suit" has many meanings, but "bathing suit" is a frequent and familiar one. The word MIRACLE, unlike, say, XEROX, indicates the effect that the product is supposed to have on the user or wearer, and is ultimately merely a declaration of praise. Just as a "miracleworker" is a person who works miracles, a "miraclesuit" is a suit that works miracles. Whether the slimming effect is literally miraculous may be subject to debate, but the mark itself communicates something about the product. Suggestive or descriptive marks are, of course, protected, but, depending on surrounding circumstances (discussed below), they may receive lesser protection than arbitrary marks.

■ We also believe that the District Court committed an error of law in its automatic conclusion that, because the Miraclesuit mark "range[d] from suggestive

to arbitrary," it therefore should receive the highest level of protection, thus dismissing efforts by Victoria's Secret to show that the Miraclesuit mark is conceptually weaker because MIRACLE has been used by several other companies. MIRACLE is used in other apparel markets, such as hosiery, children's wear, ready-to-wear, and maternity wear. The court held that these other uses were irrelevant because the term MIRACLE was not used specifically in conjunction with swimwear. *See A & H IV*, 57 F.Supp.2d at 165 n. 16. Although the wide use of a term within the market at issue is more probative than the wide use of a term in other markets, *see Fisons*, 30 F.3d at 479, the extensive use of the term in other markets may also have a weakening effect on the strength of the mark.

For example, in *Sun Banks of Florida, Inc. v. Sun Federal Savings & Loan Association*, 651 F.2d 311, 316–17 & n. 8 (5th Cir.1981), the court gave special weight to the fact that 25 competing financial institutions used the word "sun" in their titles, but also noted that over 4,400 Florida businesses used the term. The *Sun Banks* court thus clearly considered extensive use in other markets in its assessment of the weakness of the contested term. *See also Triumph Hosiery Mills, Inc. v. Triumph Int'l Corp.*, 308 F.2d 196, 199 n. 2 (2d Cir.1962) ("The mark 'Triumph' is a so-called weak mark, i.e. it has been used many times to identify many types of products and services."). The relevance of such other uses of similar marks is apparent; if a consumer is aware that a particular mark, like "Triumph" or "Ace," is often used to designate a variety of products made by a variety of manufacturers, that consumer will be less likely to assume that in a particular case, two individual products, both with the mark "Triumph," come from the same source. *See Steve's Ice Cream v. Steve's Famous Hot Dogs*, 3 U.S.P.Q.2d 1477, 1479 (T.T.A.B.1987) ("[T]he numerous third-party uses [of Steve's] demonstrate that the purchasing public has become conditioned to recognize

that many businesses ... use the term ... and ... is able to distinguish between these businesses based on small distinctions among the marks."); *cf. S.C. Johnson & Son, Inc. v. Johnson*, 116 F.2d 427, 430 (2d Cir.1940) ("When all is said, if a man allows the good will of his business to become identified with a surname so common as Johnson, it is fair to impose upon him some of the risk that another Johnson may wish to sell goods not very far afield....").

A & H notes that in *Fisons* we stated that "[w]hile other registrations and uses of Fairway for related products and services would make the mark less strong if they were in the same market, their use in different markets and for products and services that are not closely related does not necessarily undermine Fisons' claim of strength." 30 F.3d at 479. We read this sentence to mean no more than it says, and not, as A & H urges, as a per se rule against considering the use of the mark in different markets and for unrelated products. The short of it is that, whatever category of distinctiveness into which the mark falls, the multiple uses of MIRACLE in other markets is relevant to a determination of A & H's mark's strength.

### 2. Commercial Strength of the Mark

▆ Turning to the second part of the test, the District Court determined that the Miraclesuit mark has a high level of commercial strength. It based its finding on the fact that A & H had spent so much money on advertising, and that "their efforts undoubtedly resulted in increased public recognition." *A & H IV*, 57 F.Supp.2d at 165. The court also noted that A & H's swimwear sales have steadily increased. Taking these two indications of commercial strength into account, the District Court concluded that the commercial strength inquiry weighed in favor of A & H. Although evidence of money spent does not automatically translate into consumer recognition, it is clearly relevant, and hence the District Court's methodology

and conclusion does not appear to be in error or to involve a misapplication of the law.

### 3. Summary

The District Court erred in concluding that the Miraclesuit mark contained an arbitrary component, and in concluding that the mark Miraclesuit was conceptually strong solely on the basis of its categorization. However, if anything, the District Court's error weighed in A & H's favor by leading the court to reject evidence that the Miraclesuit mark was weaker than A & H claimed. Therefore, the District Court's error does not affect our affirmance of the District Court's conclusion that there was no likelihood of direct confusion between Miraclesuit and The Miracle Bra.

### C. Product Similarity

▆ In discussing product similarity, the District Court first noted that although the products were both swimsuits, they have slightly different functions: The Miraclesuit is designed and advertised to make the figure appear slim, whereas The Miracle Bra suit is designed and advertised to enhance cleavage. However, the court also noted that most Miraclesuits have bras—some even have cleavage enhancing bras—and that a few Miracle Bra suits have lower body control. A review of these facts led the District Court to conclude that the Miraclesuit and Miracle Bra suits were "somewhat interchangeable." *A & H IV*, 57 F.Supp.2d at 170. Therefore, it concluded, the product similarity factor favored A & H.

Given the evidence that, although both products may have a primary bust or midriff focus, both products also have attributes that enhance both aspects of the female figure, we do not think that the District Court clearly erred in making this finding. Furthermore, there was evidence that both products pitch themselves as "improving" female shapeliness through swimwear, and although the means of improvement are different and

the products have different foci, the two suits are similar. In sum, while the products are not identical, the court committed no error of law here, and its conclusion on product similarity is supported by the record.

### D. Marketing and Advertising Channels

 The District Court concluded that the channels of sale and advertising of the products overlap. It noted that both the price range for the suits and their means of sale are similar. It observed that the Miraclesuit has been advertised in in-store promotions, magazines, department store bill enclosures, and press kits to buyers, editors, and publishers, and that The Miracle Bra suits have been marketed in point-of-sale promotions in Victoria's Secret stores, and through press kits and print and television advertising. The court held that the channels of trade were similar, in that Miraclesuit is sold to department stores and catalogues that compete with Victoria's Secret Stores and Victoria's Secret Catalogue. Although the court noted that The Miracle Bra suits are never sold outside of the Victoria's Secret store or catalogue, and that "[s]uch fine distinctions between the channels in which the products are sold may weigh in favor of diminishing a likelihood of confusion," *A & H IV*, 57 F.Supp.2d at at 171, it concluded that the "conditions of purchase" were similar, and weighed this factor in favor of A & H.

Although there are significant differences in trade channels—notably, that Victoria's Secret sells its product only in its own stores and catalogues—perfect parallelism will rarely be found. Furthermore, the Miraclesuit has twice been sold in Victoria's Secret catalogues. Thus, the District Court did not clearly err in its factual conclusion that channels of marketing and advertising weigh in favor of A & H.

### E. Sophistication of Consumers

 The District Court next considered the "sophistication of consumers," which is the functional equivalent of *Lapp* factor (3), "the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase." The court concluded that the products' consumers were likely to be sophisticated, and weighed this factor in favor of the defendants. Three considerations drove this decision. The court relied on cases holding that buyers of women's apparel are sophisticated purchasers, and on the fact that A & H had presented no evidence that its consumers were not sophisticated. The court also noted that the "entire success" of each brand "relies on the premise that consumers will discern the slimming effect and cleavage enhancement features of their respective swimsuits." *A & H IV*, 57 F.Supp.2d at 172.

A & H submits that the District Court erred in reaching this conclusion. It points to Victoria's Secret's admission during this litigation that the attention of consumers must be captured within a few seconds. *See A & H II*, 967 F.Supp. at 1466. However, there are no hard and fast rules for this determination, and the celerity with which one makes a decision does not correlate exactly with the extent of one's discrimination in matters of taste. The District Court's conclusion that consumers will be discriminating in their selection of swimwear, whether one-piece or bikinis, rings especially true. We find no error in the District Court's conclusion that this factor weighs in favor of Victoria's Secret.

### F. The Intent of the Defendant

Before discussing this factor, it is important to reiterate the purpose of the "intent" inquiry in the *Lapp* analysis. Intent is relevant to the extent that it bears on the likelihood of confusion. We have held that a defendant's mere intent to copy, without more, is not sufficiently probative of the defendant's *success* in causing confusion to weigh such a finding in the plain-

tiff's favor; rather, defendant's intent will indicate a likelihood of confusion only if an intent to *confuse* consumers is demonstrated via purposeful manipulation of the junior mark to resemble the senior's. *See Versa Prods. Co., Inc. v. Bifold Co. (Mfg.) Ltd.*, 50 F.3d 189, 205–06 (3d Cir.1995).[16] Courts' willingness to infer the efficacy of an intent to confuse is thus somewhat punitive, due in part to a willingness to believe that a closer nexus exists between an intent to deceive and success in that effort than exists between an intent to copy and success in causing confusion. *See id.* at 205–07. Some degree of bad faith is also relevant to the selection of an appropriate remedy. *See A & H III*, 166 F.3d at 208–09.

■ The District Court found that Victoria's Secret had not intended to confuse customers when it began using The Miracle Bra in conjunction with its swimwear line. The record supports the conclusion that Victoria's Secret brought the mark into swimwear because of its success in lingerie. The court thus properly found that Victoria's Secret had not expanded The Miracle Bra into swimwear in an effort to ride on A & H's good name.

A & H argues that the court should have weighed the intent factor in its favor because when The Miracle Bra was registered for lingerie, Victoria's Secret's counsel learned that there were several pre-existing MIRACLE marks, including A & H's Miraclesuit. However, the court credited evidence that in 1994, when Victoria's Secret attempted to register The Miracle Bra for "swimsuits, bathing suits and bikinis," Victoria's Secret Stores assumed that its original trademark search had uncovered no confusingly similar registrations. *See A & H IV*, 57 F.Supp.2d at 173. The court also credited the evidence that no one at Victoria's Secret Stores responsible

for the expansion of The Miracle Bra to swimwear had ever heard of the Miraclesuit or knew that Victoria's Secret Catalogue had ever sold Miraclesuits. Further, the court found that Victoria's Secret Catalogue had chosen to expand the mark into swimwear for "legitimate reasons." *Id.* The PTO attorney's denial of registration occurred after this suit had been filed. *See id.* The District Court held, therefore, that it was "entirely credible" that no one at Victoria's Secret Stores knew about Miraclesuit and that "[a]t best, this lack of communication was a result of bureaucratic carelessness and was not intentionally done for the purpose of profiting from the notoriety of Plaintiffs' Miraclesuit mark." *Id.* at 173–74. We discern no clear error or misapplication of law in these findings, or in the District Court's weighing of the intent factor in Victoria's Secret's favor.

## G. Actual Confusion

■ The District Court found that, although there was some evidence of actual confusion, that evidence was insufficient to permit weighing this factor in A & H's favor. A & H produced an article in *Women's Wear Daily* mentioning "the introduction of the Miracle Swimsuit in the upcoming Victoria's Secret Catalog." *A & H IV*, 57 F.Supp.2d at 174. An A & H sales agent testified that a professional swimwear buyer asked him if A & H carried The Miracle Bra swimsuit; that a professional swimwear representative asked if the two were related; that a former buyer asked if the Miraclesuit had that push-up element she had hear d so much about; and that a buyer asked him for an appointment to see The Miracle Bra line. *See id.* A & H also presented testimony that one of its own public relations agents thought that A & H made both Miraclesuit and The Miracle Bra; that a buyer stated that she had hear d of the

---

**16.** In fact, as has been recognized in the trade dress context, *copying,* absent an intent to confuse, might do no more than signal to potential consumers that the junior user's product is in direct competition with the sen-

ior user's product. Such copying might thus serve a valuable communicative function. *See Conopco, Inc. v. May Dep't Stores Co.,* 46 F.3d 1556, 1565 (Fed.Cir.1994).

Miraclesuit as a suit that enhanced the bust; and that an A & H receptionist had received two inquiries concerning The Miracle Bra. *See id.*

■ The District Court, while not explicitly discrediting this evidence, viewed it with great skepticism, given the interested sources and the inability to cross-examine the supposedly confused individuals.[17] Furthermore, it concluded that, even if it credited all the submissions, the evidence of actual confusion was isolated and idiosyncratic. *See id.* at 175. This decision is supported by the case law. "Ownership of a trademark does not guarantee total absence of confusion in the marketplace. Selection of a mark with a common surname naturally entails a risk of some uncertainty and the law will not assure absolute protection." *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225, 1231 (3d Cir. 1978). Although some cases hold that, given the difficulty of proving actual confusion, relatively little showing on the part of the plaintiffs is required, *see, e.g., World Carpets, Inc. v. Dick Littrell's New World Carpets*, 438 F.2d 482, 489 (5th Cir.1971), other cases warn against using isolated instances of confusion to buttress a claim, *see, e.g., Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 263 (5th Cir.1980). It is within the District Court's discretion to consider the facts, and weigh them. In our view, the District Court's conclusion as to the absence of actual confusion was supported by the record, and hence we will not disturb its decision to weigh this factor in favor of Victoria's Secret.

### H. Combining the Factors

■ As the foregoing discussion demonstrates, the District Court carefully considered the relevant factors weighing for and against a finding of likelihood of confusion. Most importantly, the court determined that, although the overall commercial impressions of the marks are only

"somewhat distinct" if one looks just to sight, sound, and meaning, the fact that Victoria's Secret uses a housemark and a disclaimer tips the balance and makes this factor, the similarity of the marks themselves, weigh in favor of Victoria's Secret. This factor was essential to the District Court's ultimate finding of fact; it found that "solely" on the assumption that the disclaimer would continue to be used, the marks were not similar. As to the other factors, the court found that: (1) the products; and (2) the channels of marketing were sufficiently similar to weigh those factors in favor of A & H, but that: (3) the consumers were sophisticated; (4) Victoria's Secret exhibited no culpable intent in selecting its mark; and (5) there was insufficient credible evidence of instances of actual confusion, all of which weighed in favor of Victoria's Secret. We find no reason to disturb any of these findings. Finally, the court also concluded that the mark Miraclesuit merited a high level of protection, and weighed this factor in favor of A & H. Though we believe that the District Court could have been more emphatic in its finding that the marks were dissimilar, and may also have overrated the strength of the Miraclesuit mark, these factors only support our affirmance of the ultimate conclusion that the marks are not likely to be directly confused.

Although a number of factors favored A & H, these do not upset the balance. In sum, we find no error in the District Court's careful consideration and weighing of the factors, and its use of them as tools in reaching its ultimate finding of fact. We therefore will affirm the judgment with respect to the direct confusion claim.

### V. The Reverse Confusion Claim

#### A. Introduction

■ We recently recognized the doctrine of "reverse confusion" as a distinct

---

17. The court also chose not to credit the surveys conducted by either side, a decision that has not been challenged.

basis for a claim under § 43(a) of the Lanham Act. *See Fisons*, 30 F.3d at 475. While the essence of a direct confusion claim is that a junior user of a mark is said to free-ride on the "reputation and good will of the senior user by adopting a similar or identical mark," *id.*, reverse confusion occurs when "the junior user saturates the market with a similar trademark and overwhelms the senior user." *Id.* (quoting *Ameritech, Inc. v. American Info. Techs. Corp.*, 811 F.2d 960, 964 (6th Cir. 1987)). The harm flowing from reverse confusion is that

> [t]he public comes to assume the senior user's products are really the junior user's or that the former ·has become somehow connected to the latter.... [T]he senior user loses the value of the trademark—its product identity, corporate identity, control over its goodwill and reputation, and ability to move into new markets.

*Ameritech, Inc.*, 811 F.2d at 964; *see also Fisons*, 30 F.3d at 479; *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 957 (7th Cir.1992); *Banff, Ltd. v. Federated Dep't Stores, Inc.*, 841 F.2d 486, 490–91 (2d Cir.1988); *Capital Films Corp. v. Charles Fries Prods, Inc.*, 628 F.2d 387, 393 (5th Cir.1980); *Big O Tire Dealers, Inc., v. Goodyear Tire & Rubber Co.*, 561 F.2d 1365, 1372 (10th Cir.1977). As we explained in *Fisons*, reverse confusion protects "smaller senior users ... against larger, more powerful companies who want to use identical or confusingly similar trademarks." 30 F.3d at 475. Absent reverse confusion, "a company with a well established trade name and with the economic power to advertise extensively [would be immunized from suit] for a product name taken from a competitor." *Big O Tire Dealers, Inc.*, 561 F.2d at 1372 (citation omitted).The doctrine of reverse confusion—or, at least, some of its applications—is not without its critics. *See, e.g.,*

Thad G. Long & Alfred M. Marks, *Reverse Confusion: Fundamentals and Limits*, 84 Trademark Rep. 1, 2–3 (1994); Daniel D. Domenico, Note, *Mark Madness: How Brent Musburger and the Miracle Bra May Have Led to a More Equitable and Efficient Understanding of the Reverse Confusion Doctrine in Trademark Law*, 86 Va.L.Rev. 597, 613–14, 621–24 (2000).[18] The chief danger inherent in recognizing reverse confusion claims is that innovative junior users, who have invested heavily in promoting a particular mark, will suddenly find their use of the mark blocked by plaintiffs who have not invested in, or promoted, their own marks. *See Weiner King, Inc. v. Wiener King Corp.*, 615 F.2d 512, 522 (C.C.P.A.1980). Further, an overly-vigorous use of the doctrine of reverse confusion could potentially inhibit larger companies with established marks from expanding their product lines—for instance, had Victoria's Secret thought, at the outset, that it would not be permitted carry over its popular The Miracle Bra mark from lingerie to swimwear, it might have chosen not to enter the swimsuit market at all.

This would be an undesirable result; in fact, it is precisely to allow a certain amount of "space" for companies to expand their product lines under established marks that we allow infringement suits against suppliers of noncompeting goods. *See Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 464 (3d Cir.1983). This is not to say that the reverse confusion doctrine does not have its proper place; as has been recognized, without the existence of such a claim, smaller business owners might not have any incentive to invest in their marks at all, for fear the mark could be usurped at will by a larger competitor. *See SK & F, Co. v. Premo Pharm. Labs., Inc.*, 625 F.2d 1055, 1067 (3d Cir.1980) ("[P]ermitting piracy of ... identifying trade dress can only discourage other

---

**18.** The Domenico note analyzes, *inter alia,* the propriety of the remedy awarded by the District Court in *A & H II.*

manufacturers from making a similar individual promotional effort."). However, these concerns do sensitize us to the potential untoward effects of an overenthusiastic enforcement of reverse confusion claims, although they cannot supersede our judicial recognition of the doctrine.

## B. The Test for Reverse Confusion

■ As in a direct confusion claim, the ultimate question in a reverse confusion claim is whether there is a likelihood of consumer confusion as to the source or sponsorship of a product. *See Fisons*, 30 F.3d at 475. Although it would seem somewhat counterintuitive to posit that the likelihood of confusion analysis changes from the direct confusion to the reverse confusion context,[19] there are differences between the two situations that bear mentioning. Therefore, to clarify the test for reverse confusion that has developed in our jurisprudence, we will walk through the factors that a district court should consider (where relevant) in assessing a such a claim.

### 1. The Factors that are the Same

■ As an initial matter, there are several factors that should generally be analyzed in the same way for a reverse confusion claim as they are for a direct confusion claim.[20] First, the attentiveness of consumers does not change (factor (3)); in both direct and reverse confusion, the question is whether this is the kind of product that consumers will care enough about to notice the differences, or purchase hastily with only a limited impression. *See Fisons*, 30 F.3d at 476 n. 12 (considering this factor in the same manner as it would for direct confusion). Sec-

ond, and similarly, the degree to which the channels of trade and advertisement overlap (factor (7)) should be analyzed in the same fashion. *See id.* at 475–76 (analyzing the channels of trade in the same manner). Finally, *Lapp* factors (8) and (9), considering the similarity of the targets of the parties' sales efforts and the similarity of products, are also analyzed no differently in the reverse confusion context. *See id.* at 475, 481 (treating these factors in the same way for reverse confusion as they would have been treated for direct confusion).

### 2. Similarity of the Marks

■ Generally speaking, the similarity of the marks themselves is necessarily analyzed in the same way in direct and reverse confusion claims; the court looks to sight, sound, and meaning, and compares whether these elements combine to create a general commercial impression that is the same for the two marks. *See, e.g.*, *Fisons*, 30 F.3d at 478–79 (analyzing the commercial impression of the marks in light of direct confusion principles). Therefore, a district court would not need to examine these in a different manner than it would in a direct confusion claim.

On the other hand, the direct confusion claim in this case was rejected by the District Court in considerable measure because the court felt that the Victoria's Secret housemark, coupled with the disclaimer, alleviated any confusion that might otherwise result. *See A & H IV*, 57 F.Supp.2d at 168–69. Yet in the reverse confusion context, the presence of housemarks or disclaimers must obviously be treated differently than in the direct confu-

---

19. Indeed, some courts have simply inquired whether there exists a likelihood of confusion between the marks, temporarily putting aside the distinction between "direct" or "reverse" confusion until after such a likelihood has been demonstrated. *See Americana Trading Inc. v. Russ Berrie & Co.*, 966 F.2d 1284, 1290 (9th Cir.1992) (reversing district court grant of summary judgment to defendants, on the ground that plaintiffs had put forth enough

evidence of "confusion"—some direct, some reverse—to create a genuine issue of material fact).

20. We say "generally" only because we recognize that there may be unforeseen circumstances in which these factors actually do apply differently in the reverse confusion context.

sion context. It is the essence of the reverse confusion claim that, when consumers come across the Miraclesuit in the stream of commerce, they will confuse it with The Miracle Bra and think that it is a Victoria's Secret product. Therefore, the weight of a disclaimer on the Victoria's Secret product is necessarily lessened. Because A & H puts no disclaimer on its product to distinguish it from The Miracle Bra, the consumer considering a purchase of the Miraclesuit will not have the same handy reminder that Miraclesuit is not associated with The Miracle Bra or Victoria's Secret. This is not to say that such a disclaimer may not, in fact, mitigate confusion in some cases; if consumers are faced with the disclaimer every time they flip through the Victoria's Secret catalogue, they are less likely to forget that Miraclesuit is unrelated to The Miracle Bra swimwear.

As to the presence of the housemark on the Victoria's Secret product, not only is there the possibility that consumers will fail to remember the mark when encountering A & H's swimwear, but there is also the possibility that the mark will *aggravate*, rather than mitigate, reverse confusion, by reinforcing the association of the word "miracle" exclusively with Victoria's Secret. *See, e.g., Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 960 (7th Cir.1992); *Americana Trading Inc. v. Russ Berrie & Co.*, 966 F.2d 1284, 1288 (9th Cir.1992). Of course, we do not suggest that this actually occurred in this particular case; after all, the District Court observed that A & H typically includes its own housemark on Miraclesuits, *see A & H IV*, 57 F.Supp.2d at 160, but, because the court only conducted a likelihood of confusion analysis for the direct confusion claim, it only briefly addressed the significance of the A & H housemark, *see id.* at 168 n. 17.

Clearly, the proper significance to be accorded these facts is a matter best suited for the determination of the trial court. Instead, we merely highlight the questions raised by the use of the housemarks and disclaimers in order to emphasize that a district court must separately examine the similarity factor to determine whether there are any aspects of the analysis that should be different for a reverse confusion claim, and, if so, alter its examination accordingly.

### 3. Strength of the Marks

An important difference between reverse and direct confusion manifests in the analysis of the strength of the marks. As we explained *supra*, this factor requires consideration both of the mark's commercial and conceptual strength. For ease of understanding, we will explain the appropriate treatment of commercial strength first, and the treatment of conceptual strength second.

#### a. Commercial Strength

It has been observed that a consumer first encountering a mark with one set of goods is likely to continue to associate the mark with those goods, and whether any subsequent confusion is "direct" or "reverse" will depend on whether the consumer's first experience was with the junior or the senior user of the mark. *See Banff, Ltd. v. Federated Dep't Stores, Inc.*, 841 F.2d 486, 490 (2d Cir.1988) (acknowledging such a possibility); Long & Marks, *supra*, at 5. The greater the commercial disparity between the manufacturers, the more likely it is that a consumer's first experience with a mark will be with one particular manufacturer. That is, if one manufacturer—junior or senior—expends tremendous sums in advertising while the other does not, consumers will be more likely to encounter the heavily advertised mark first. Where the greater advertising originates from the senior user, we are more likely to see a case of direct confusion; if the greater advertising originates from the junior user, reverse confusion is more likely. *See* 3 McCarthy, *supra*, § 23:10, at 23–32; *cf. Fisons*, 30 F.3d at 479 (observing that direct confusion involves a junior user

"trad[ing] on" a senior user's name and thus expending less on advertising, whereas reverse confusion involves the opposite pattern).

Logically, then, in a direct confusion claim, a plaintiff with a commercially strong mark is more likely to prevail than a plaintiff with a commercially weak mark. Conversely, in a reverse confusion claim, a plaintiff with a commercially weak mark is more likely to prevail than a plaintiff with a stronger mark, and this is particularly true when the plaintiff's weaker mark is pitted against a defendant with a far stronger mark. McCarthy has written that "the relatively large advertising and promotion of the *junior* user ... is the hallmark of a reverse confusion case." 3 McCarthy, *supra*, § 23:10, at 23–37. "[T]he lack of commercial strength of the smaller senior user's mark is to be given less weight in the analysis because it is the strength of the larger, junior user's mark which results in reverse confusion." *Commerce Nat'l Ins. Servs., Inc. v. Commerce Ins. Agency, Inc.*, 214 F.3d 432, 444 (3d Cir.2000). As we explained in *Fisons*, "the evidence of commercial strength is different from what we expect in a case of forward confusion, where the junior user tries to palm off his goods as those of the senior user." 30 F.3d at 479.

■■■ Therefore, in a reverse confusion claim, a court should analyze the "commercial strength" factor in terms of (1) the commercial strength of the junior user as compared to the senior user; and (2) any advertising or marketing campaign by the junior user that has resulted in a saturation in the public awareness of the junior user's mark. *See Fisons*, 30 F.3d at 474, 479.

### b. Distinctiveness or Conceptual Strength

In *Fisons* we remanded the case for the district court to "reevaluate[ ] ... distinctiveness as well as [the mark's] commercial strength" for the reverse confusion claim. *Fisons*, 30 F.3d at 479. Although we ex-

plained that the evaluation of commercial strength would have to be altered for reverse confusion claims, we did not discuss how distinctiveness, or conceptual strength, should be re-weighed in light of our adoption of the reverse confusion doctrine. Nor did we clarify this aspect of our jurisprudence in *Commerce National Insurance Services, Inc. v. Commerce Insurance Agency, Inc.*, 214 F.3d 432 (3d Cir.2000), where we referred to the different test for "commercial strength," in a reverse confusion context, without reference to "conceptual strength."

■■■ As stated above, in the paradigmatic reverse confusion case, the senior user has a commercially weak mark when compared with the junior user's commercially strong mark. When it comes to conceptual strength, however, we believe that, just as in direct confusion cases, a strong mark should weigh in favor of a senior user. Our decision is supported by the fact that those courts that have clearly distinguished conceptual from commercial strength in the reverse confusion context have weighed a conceptually strong mark in the senior user's favor, in the same manner as they would in direct confusion cases. *See, e.g., Worthington Foods, Inc. v. Kellogg Co.*, 732 F.Supp. 1417, 1456 (S.D.Ohio 1990).

In *H. Lubovsky, Inc. v. Esprit de Corp.*, 627 F.Supp. 483 (S.D.N.Y.1986), the court explained that conceptual distinctiveness was relevant in the same way for a reverse confusion claim because "if a customer saw a doll in a toy store bearing a strong familiar trademark like 'Exxon,' he might well assume that the oil company had gone into the toy business; if, on the other hand, he saw a doll bearing a familiar but weak laudatory trademark like Merit, he would be unlikely to assume that it is connected with the similarly named gasoline or cigarettes." *Id.* at 487; *see also* Long & Marks, *supra*, at 22.

■■■ The *H. Lubovsky* logic resonates, for it makes more sense to hold that con-

ceptual strength, unlike commercial strength, works in the plaintiff's favor. That is, if we were to apply the rule stated above for commercial strength, i.e., weighing weakness in the plaintiff's favor, we would bring about the perverse result that less imaginative marks would be more likely to win reverse confusion claims than arbitrary or fanciful ones. We therefore hold that, as in direct confusion claims, a district court should weigh a conceptually strong mark in the plaintiff's favor, particularly when the mark is of such a distinctive character that, coupled with the relative similarity of the plaintiff's and defendant's marks, a consumer viewing the plaintiff's product is likely to assume that such a mark would only have been adopted by a single source—i.e., the defendant.

### 4. The Intent of the Defendant

In the direct confusion context, the intent of the defendant is relevant to the extent that it bears on the likelihood of confusion analysis. As we have said:

> In the likelihood of confusion inquiry ... we do not focus on a defendant's bare intent to adopt a mark ... substantially identical to a plaintiff's mark ..., since there is little basis in fact or logic for supposing from a defendant's intent to copy without more that the defendant's actions will in fact result in confusion. Thus, what we have held is that a defendant's intent to confuse or deceive consumers as to the product's source may be highly probative of likelihood of confusion.

*Versa Prods. Co., Inc. v. Bifold Co. (Mfg.) Ltd.*, 50 F.3d 189, 205 (3d Cir.1995) (emphasis omitted).

■ When reverse, rather than direct, confusion is alleged, "intent to confuse" is unlikely to be present. *Cf. Fisons*, 30 F.3d at 480. However, though perhaps unusual, should an intent to confuse exist, it would be relevant to the likelihood of confusion analysis in the same manner as it would for a direct confusion claim. For instance,

in *Commerce National Insurance Services, Inc. v. Commerce Insurance Agency, Inc.*, 214 F.3d 432 (3d Cir.2000), we were confronted with a situation in which the litigants had used very similar marks in noncompetitive industries for a number of years, each fully aware of the other and with no incidents of actual confusion. Eventually, however, the larger company expanded into the smaller company's line of business, deliberately choosing to promote its services under an almost identical mark. In holding that the smaller company could maintain its claim against the larger for reverse confusion, we specifically highlighted the possibility that the larger company had adopted the mark with the deliberate intent of pushing its rival out of the market, and that it was this sort of usurpation of business identity that the reverse confusion doctrine was designed to prevent. *See id.* at 445.

As we have noted in our two prior cases on this issue, the defendant's intent may be discovered through such inquiries as whether the defendant was aware of the senior user's mark when it adopted its own mark, and whether the defendant considered that its adoption of the mark might result in confusion. *See id.* at 444; *Fisons*, 30 F.3d at 480. If such an intent to confuse does, in fact, exist in a reverse confusion case, it should weigh against the defendant in the same manner as it would in a direct confusion case. *Cf. W.W.W. Pharm. Co., Inc. v. Gillette Co.*, 984 F.2d 567, 575 (2d Cir.1993) (weighing the "intent" factor in a reverse confusion case in the defendant's favor because the plaintiff had not demonstrated an intent to confuse).

■ Although we recognize that our opinion in *Fisons* perhaps implied that mere carelessness, as opposed to deliberate intent to confuse, would weigh in a plaintiff's favor in a reverse confusion case, we are reluctant to adopt such an interpretation, as it would be manifestly out of step with our prior holdings regarding the rele-

vance of "intent" in trademark infringement claims. *Cf. O. Hommel Co. v. Ferro Corp.*, 659 F.2d 340, 354 (3d Cir.1981). Ultimately, all of the *Lapp* factors are meant only to determine whether *confusion* is likely; mere carelessness, like deliberate copying, does not shed any light on this inquiry. Further, to the extent that the intent inquiry in the likelihood of confusion analysis carries with it the attribution of fault, there is no reason to ascribe higher penalties to a lower degree of fault because a particular case involves reverse, rather than direct, confusion. Finally, in light of the policy concerns implicated by the reverse confusion doctrine, it would be troubling indeed to hold that a *lesser* degree of culpability would weigh in the plaintiff's favor for a reverse confusion claim than it would for a direct confusion claim.

### 5. Factors Relating to Actual Confusion

As a matter of intuition, one would expect that in a reverse confusion claim, evidence of actual confusion would be as important as in a direct confusion claim, though the nature of the confusion that would be probative would be quite different. *See Lang v. Retirement Living Publ'g Co.*, 949 F.2d 576, 583 (2d Cir.1991) (holding that evidence of "actual confusion" in which the public thought the senior user was the origin of the junior user's products was irrelevant for a reverse confusion claim). As applied to this case, for example, evidence that consumers thought that The Miracle Bra was an A & H product would be probative on a direct confusion claim, but not on a reverse confusion claim. Conversely, evidence that consumers thought that Miraclesuit was a Victoria's Secret product would support a reverse confusion claim, but not a direct confusion claim. This was apparently the District Court's intuition; although it declined to consider A & H's reverse confusion claim, it did observe that most of the evidence A & H had put forth with regard to "actual confusion" related to direct,

rather than reverse, confusion. *See A & H IV*, 57 F.Supp.2d at 178 n. 32.

However, marshalling evidence of actual confusion is often difficult. *See, e.g., Liquid Glass Enters., Inc. v. Dr. Ing. h.c.F. Porsche AG*, 8 F.Supp.2d 398, 403 (D.N.J. 1998). In our view, if we were to create a rigid division between "direct" and "reverse" confusion evidence, we would run the risk of denying recovery to meritorious plaintiffs. For example, if a plaintiff alleged theories of both direct and reverse confusion and was able to prove a few instances of "actual" confusion in each direction, we might conclude that the plaintiff did not have enough evidence of either type to succeed on either of its claims, even though, taken together, all of the evidence of actual confusion would be probative of a real problem. As we explained in Part V.B.3, *supra*, the manifestation of consumer confusion as "direct" or "reverse" may merely be a function of the context in which the consumer first encountered the mark. Isolated instances of "direct" confusion may occur in a reverse confusion case, and vice-versa. *See* Long & Marks, *supra*, at 5. Though we might expect that, in most instances, the consumer's first encounter will be with the mark that has greater commercial strength, this will not invariably be the case.

■ Given the problems litigants typically encounter in locating evidence of actual confusion, then, we decline to create a strict bar to the use of "direct" confusion evidence in a "reverse" confusion case, or vice versa. However, evidence working in the same direction as the claim is preferred, and "misfitting" evidence must be treated carefully, for large amounts of one type of confusion in a claim for a different type may in fact work against the plaintiff. For instance, the existence of reverse confusion might disprove a plaintiff's claim that its descriptive mark has secondary meaning, thus resulting in no recovery at all. *See Jefferson Home Furniture Co.,*

*Inc. v. Jefferson Furniture Co., Inc.*, 349 So.2d 5, 8 (Ala.1977).

It follows that the other factor relating to actual confusion, *Lapp* factor (4), examining the time the mark has been used without evidence of actual confusion, should be approached similarly.

### 6. Other Relevant Facts

The final factor of the *Lapp* test directs courts to look at "other facts suggesting that the consuming public might expect the prior owner to manufacture both products, or expect the prior owner to manufacture a product in the defendant's market, or expect that the prior owner is likely to expand into the defendant's market." This factor is necessarily transformed in the reverse confusion context to an examination of other facts suggesting that the consuming public might expect the larger, more powerful company to manufacture both products, or expect the larger company to manufacture a product in the plaintiff's market, or expect that the larger company is likely to expand into the plaintiff's market. *See Fisons*, 30 F.3d at 480 (directing the district court to examine facts suggesting that the public might think that the junior user would expand into the senior user's market).

### 7. Summary of the Test for Reverse Confusion

In sum, in the typical case in which there is a claim of reverse confusion, a court should examine the following factors as aids in its determination whether or not there is a likelihood of such confusion:

(1) the degree of similarity between the owner's mark and the alleged infringing mark;

(2) the strength of the two marks, weighing both a commercially strong junior user's mark and a conceptually strong senior user's mark in the senior user's favor;

(3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;

(4) the length of time the defendant has used the mark without evidence of actual confusion arising;

(5) the intent of the defendant in adopting the mark;

(6) the evidence of actual confusion;

(7) whether the goods, competing or not competing, are marketed through the same channels of trade and advertised through the same media;

(8) the extent to which the targets of the parties' sales efforts are the same;

(9) the relationship of the goods in the minds of consumers, whether because of the near-identity of the products, the similarity of function, or other factors;

(10) other facts suggesting that the consuming public might expect the larger, more powerful company to manufacture both products, or expect the larger company to manufacture a product in the plaintiff's market, or expect that the larger company is likely to expand into the plaintiff's market.

As with the test for direct confusion, no one factor is dispositive, and in individual cases, particular factors may not be probative on the issue of likelihood of confusion. "The weight given to each factor in the overall picture, as well as its weighing for plaintiff or defendant, must be done on an individual fact-specific basis." *Fisons*, 30 F.3d at 476 n. 11.

### C. The District Court's Opinion

The District Court approached the reverse confusion claim in a different manner from that described in the foregoing section. It held that *before* engaging the reverse confusion factors, A & H needed to demonstrate, as a threshold matter, that Victoria's Secret "used their economic power to overwhelm the market with advertising" of their product. *A & H IV*, 57 F.Supp.2d at 178. The opinion therefore

focused only on a comparison between the commercial strengths of the Miraclesuit and The Miracle Bra, i.e., only on one aspect of the "mark strength" inquiry. The District Court found that Victoria's Secret had saturated the market with $13 million in The Miracle Bra advertising, and that a "meaningful portion" of the advertising went towards promoting The Miracle Bra swimwear. It then compared Victoria's Secret's effort to A & H's effort to promote Miraclesuit swimwear; A & H spent over $1.2 million on advertising, and received $1.5 million in free publicity.[21]

The court noted that A & H did not dispute—even heralded—the fact that its campaign was widely successful. Therefore, it found that "[p]laintiffs' [sic] are not entirely without market power in the swimwear industry" and that "[i]n light of Plaintiffs' advertising campaign, we find that, in comparison, Defendants did not saturate the marketplace with its advertising to promote The Miracle Bra swimwear." *Id.* at 177. Consequently, the District Court concluded that the doctrine of reverse confusion was not even implicated, and "decline[d] to examine whether a likelihood of reverse confusion exists." *Id.* at 178.

In *A & H III*, we began our discussion of reverse confusion with an explanation of the phenomenon: "Reverse confusion occurs when a larger more powerful company uses the trademark of a smaller, less powerful senior owner and thereby causes likely confusion as to the source of the senior user's goods or services." 166 F.3d at 207 (quoting *Fisons*, 30 F.3d at 474.). In *Fisons*, we stated that it would be necessary to recognize the reverse confusion doctrine to provide protection to "smaller, senior users" against "larger, more powerful companies." 30 F.3d at 475. While these are accurate statements about the doctrine of reverse confusion, the District Court appears to have inter-

preted them as establishing a separate, threshold step that must be examined prior to engaging the *Lapp* test, and, finding the threshold not met, concluded that A & H's power to advertise extensively precluded it from bringing a reverse confusion claim. The District Court was correct to note that commercial disparity is, in fact, a factor to consider (factor (2), to be specific); however, it erred in applying a threshold commercial disparity requirement, in effect making this sole factor determinative and treating the reverse confusion inquiry as requiring a two-step process.

The quoted statements are understandably confusing, and the method of applying the doctrine of reverse confusion is admittedly still developing. However, a close examination of *Fisons*, from which the quotes hail, reveals that they are nothing more than descriptions of the phenomenon of reverse confusion, and do not establish an initial inquiry that a court needs to make in order to apply the reverse confusion analysis. In *Fisons* we held that the *Lapp* factors constitute the method courts should use in order to determine if a likelihood of reverse confusion exists. We made no mention of a threshold requirement, nor did we direct the District Court, on remand, to use one.

The District Court further explained its choice not to apply the reverse confusion factors by reference to the fact that several reverse confusion cases involve enormous junior companies pitted against tiny senior companies; it cited these cases and concluded that the same degree of economic disparity was non-existent in this case. *See A & H IV*, 57 F.Supp.2d at 178. The difficulty with this conclusion is that in *Fisons* itself, in which we found a viable reverse confusion claim, Fisons had fully 25% of the peat moss market, greater than A & H's 10% of the swimwear market. This suggests that a company need not be all that weak within its market in order to

---

21. This finding is significant because A & H contends that the court erred in considering A & H's free publicity, but not considering

whether Victoria's Secret received the same, as is discussed in Part V.D.3, *infra.*

bring a viable reverse confusion claim. *See Fisons*, 30 F.3d at 479; *see also Fuji Photo Film v. Shinohara Shoji Kabushiki*, 754 F.2d 591 (5th Cir.1985) (finding a viable reverse confusion claim where the plaintiff had spent millions of dollars). In fact, in stating that "[i]n reverse confusion, the junior user is *typically* a wealthier, more powerful company who can overwhelm the market with advertising," 30 F.3d at 479 (emphasis added), we implied that there might be the rare case in which reverse confusion exists where the junior company overwhelms the senior user with advertisements although it is *not* wealthier and more powerful.

In short, we hold that, although economic disparity between the companies and the marks is an important consideration in the evaluation of the marks' commercial strength, the District Court legally erred in fashioning a threshold "economic disparity" requirement before a reverse confusion claim will even be considered. Because the District Court failed to undertake the *Lapp* analysis with respect to A & H's reverse confusion claim, we must vacate the judgment with respect to that claim and remand to the District Court for a redetermination of those factors that receive different treatment under direct and reverse confusion theories, and for a reweighing of all of the factors once those redeterminations have been made.

### D. Guidance for Remand

#### 1. Introduction

If the record suggested that, under the test we have set forth, A & H could not succeed as a matter of law in a reverse confusion claim, we would be bound to explicate our reasoning and affirm the judgment of the District Court. However, we do not so conclude, and hence vacatur and remand is necessary. Inasmuch as we have clarified the law of reverse confusion in this circuit by filling the gaps left in *Fisons*, it will be useful to the District Court if we comment on the extent to which it needs to revisit the various issues.

As explained *supra*, the factors concerning the market, sales, and function similarity (factors (3), (7), (8) & (9)) need not be reexamined for the reverse confusion claim because the District Court has already discussed them in connection with direct confusion and there is typically no difference in the analysis of these factors for reverse and direct confusion claims. As for the "actual confusion" factors ((4) & (6)), the District Court did not credit the evidence proffered by A & H and, in its best light, regarded it as de minimis. A & H's evidence of actual confusion primarily supported its claim for direct, rather than reverse, confusion, *see supra* Section IV.G, with the only exception being the *Women's Wear Daily* article mentioning "the introduction of the Miracle Swimsuit in the upcoming Victoria's Secret catalog." Because these incidents, though relevant to reverse confusion, are more probative of direct confusion but the District Court felt that they were too weak to support even that claim, the court may, but need not, reexamine this factor on remand.

#### 2. Similarity of the Marks

When addressing the direct confusion claim, the District Court placed great weight on the presence of Victoria's Secret's housemark and disclaimer when it concluded that the marks were not confusingly similar. *See A & H IV*, 57 F.Supp.2d at 168–69. However, as we explained *supra*, although such embellishments of the junior user's mark may still have relevance in the reverse confusion context, their weight must necessarily be reevaluated. Therefore, on remand, the District Court should reconsider the similarity of the marks in light of A & H's reverse confusion claims.

#### 3. Strength of the Marks

The District Court did not consider the commercial strength of the marks within the ambit of the reverse confusion *Fisons* analysis, but it functionally did as

much in its "threshold" determination that A & H lacked sufficient "economic disparity" relative to Victoria's Secret to advance a reverse confusion claim. Therefore, the District Court essentially demonstrated that it weighed this factor in favor of Victoria's Secret. However, in comparing the relative commercial strengths of the products, the District Court committed clear error: Although it considered the free publicity received by A & H in determining its commercial strength, it did not consider the free publicity received by Victoria's Secret. This led to an inaccurate comparison of their relative commercial vitality. Had the court used the same calipers to measure the commercial strength of each, it might have determined that the Miraclesuit had less commercial strength relative to The Miracle Bra. Of course, the court might well deem the difference unimportant, but we cannot say that either Victoria's Secret or A & H should have this factor weighed in its favor as a matter of law.

Furthermore, the court should have also considered the conceptual strength of the Miraclesuit mark, according to the standards for conceptual strength set forth in Sections IV.B and V.B.3, *supra*. In so doing, the court must gauge the strength of the Miraclesuit mark and must consider whether—as with the example set forth *supra* involving a doll with the mark "Exxon"—the Miracle Bra/Miraclesuit marks are so distinctive that, when considered simultaneously with the court's determination as to their similarities, consumers with a general awareness of The Miracle Bra swimsuit are likely to assume that the Miraclesuit is a Victoria's Secret product.

#### 4. Intent

In its evaluation of A & H's direct confusion claim, the District Court concluded that Victoria's Secret's "choice to extend The Miracle Bra mark to swimwear was for legitimate reasons, rather than out of bad faith." *A & H IV*, 57 F.Supp.2d at 172. However, because it "decline[d] to

examine whether a likelihood of reverse confusion exists," *id.* at 178, the District Court focused on whether Victoria's Secret had intended to "profit[ ] from the notoriety of Plaintiffs' Miraclesuit mark," *A & H IV*, 57 F.Supp.2d at 173–74. The court did not specifically address the question whether Victoria's Secret, rather than intending to "free ride" on A & H's goodwill, instead intended to usurp it by deliberately undertaking to cause consumer confusion (and thereby destroy A & H's business identity). On remand, the District Court should consider whether its previous finding of Victoria's Secret's good faith is dispositive of the reverse confusion intent analysis, or whether further examination of this issue is warranted.

#### E. Summary

Although we believe that the District Court's evaluation of individual factors relating to market, sales, and functionality would have remained unchanged had it examined A & H's reverse confusion claim in light of the *Lapp* factors, we simply do not know how it would have treated the commercial strength and mark similarity factors had it considered the free advertising The Miracle Bra received, or the effect of the housemark and disclaimer in the reverse confusion context. We also cannot predict what the result would have been had the District Court examined the "intent" factor in light of A & H's reverse confusion claim, or how the District Court would have weighed the various factors had it not determined that there was a threshold commercial disparity requirement.

The question of likelihood of confusion is ultimately one of fact, and we cannot roll up our sleeves and engage in the balancing ourselves. In its balancing on the direct confusion claim, the District Court found that the case was close, holding that no likelihood of confusion existed "solely *based on the presumption* that Defendants will continue to use the disclaimer when marketing The Miracle Bra swimwear," *A*

238

& *H IV*, 57 F.Supp.2d at 169. As we have explained, we believe that Victoria's Secret's disclaimer has a lessened significance for reverse confusion. We also believe that the conceptual strength of the Miraclesuit mark must be reevaluated. Under these circumstances, we cannot say as a matter of law that a different weighing of the factors could not have influenced the District Court to make a different finding of ultimate fact, thus necessitating a remand.

## VI. Conclusion

We will affirm the District Court's judgment for Victoria's Secret on the direct confusion claim. However, we will vacate the judgment with respect to the reverse confusion claim, and remand to the District Court for further proceedings consistent with this opinion. The District Court may wish to hear and consider additional evidence from the parties on reverse confusion. The parties shall bear their own costs.