**ADVANCE MAGAZINE PUBLISHERS INC., d/b/a The Condé Nast Publications Inc., Plaintiff,**

v.

**VOGUE INTERNATIONAL and Fred J. Zito, Defendants.**

**No. Civ. 00–4614.**

United States District Court, D. New Jersey.

Dec. 12, 2000.

Donald A. Robinson, Robinson, Lapidus & Livelli, Newark, NJ, for Advance Magazine Publishers Inc.

Fred J. Zito, North Brunswick, NJ, pro se.

1. The facts set forth herein are based on the statement of facts and supporting affidavits provided by plaintiff and the testimony of

## OPINION

HOCHBERG, District Judge.

This matter comes before the Court on a motion filed by plaintiff, Advance Magazine Publishers Inc. d/b/a The Condé Nast Publications Inc. ("AMP") for a preliminary injunction restraining and enjoining defendants Vogue International and Fred J. Zito from maintaining, using or transferring the domain names teenvogue.com, teenvogue.net and vogue-international.com, and the company name Vogue International.

AMP is the owner/ publisher of the magazine *Vogue* and the recently released magazine *Teen Vogue*. Defendants use the domain names teenvogue.com, teenvogue.net and vogue-international.com, and the company name Vogue International in connection with a web-based retail business that offers clothing, cosmetics and fashion accessories for sale. AMP alleges that this use infringes and dilutes AMP's trademarks in violation of the Lanham Act and unfairly competes with AMP's trademarks in violation of the Lanham Act, New Jersey law and the common law. AMP also argues that defendants' registration and maintenance of the domain names teenvogue.com, teenvogue.net and vogue-international.com constitutes cyberpiracy in violation of the federal Anticybersquatting Consumer Protection Act (the "ACPA").

For the reasons that follow, plaintiff's request for a preliminary injunction is hereby granted and defendants are enjoined from maintaining, transferring or using the domain names teenvogue.com, teenvogue.net and vogue-international.com, and the company name Vogue International.

## I. FACTUAL AND PROCEDURAL HISTORY[1]

AMP is the publisher of numerous well-known magazines, including *Vogue*, which

three witnesses for the plaintiff at the preliminary injunction hearing on November 27, 2000. Despite ample notice of the motion for

is distributed throughout the United States and internationally. *Vogue* magazine was first published in the United States in 1892 and has been sold continuously ever since. *Vogue* has been a leading fashion and style magazine in the United States for many decades, and provides coverage of trends in the worlds of fashion, beauty, health, cosmetics, entertaining, decorating, food, travel and the arts. *Vogue* expanded worldwide in 1916 when it was launched in Britain; since then, *Vogue* has been published in France, Australia, Italy, Brazil, Germany, Spain, Korea, Taiwan, Russia, Japan and, most recently, Greece. AMP has also created and published several related *Vogue* publications internationally.

AMP is the owner of numerous trademark registrations for the Vogue trademark, both in the United States and throughout the world. Some of AMP's United States Vogue trademark registrations include Registration Nos. 1,336,659; 1,666,656; 69,530; 103,770; 504,006; and 1,659,761. These registrations date back as far as 1908, and each is "incontestible" under 15 U.S.C. § 1065. In addition, AMP is the owner of numerous United States trademarks incorporating the term "Vogue," including "As Seen in Vogue", "Vogue Sposa", "Vogue Gioielle", and "Vogue Bambini". The trademarks referred to in this paragraph are hereinafter referred to collectively as the "Vogue Trademarks".

AMP registered the domain name vogue.com with the registrar Network Solutions, Inc. in 1994. Since that time, AMP and its licensees and affiliates have developed and maintained Internet sites where consumers throughout the world can access information about U.S. and international editions of *Vogue*. The vogue.com website provides coverage of fashion collections, celebrities and celebrity events, offers subscriptions to *Vogue* magazine, and provides links enabling visitors to the site to purchase clothing and fashion accessories on-line. In addition, advertising by third parties on the website has been considerable, particularly among cosmetics companies.

The Managing Editor of *Vogue* magazine testified that AMP decided in 1999 to launch a version of *Vogue* magazine for teenagers. A "dummy" magazine was created in the summer of 1999 and circulated to advertising representatives beginning in approximately September, 1999 to evaluate the level of interest in the magazine. AMP filed an intent-to-use application for registration of the trademark "Teen Vogue" with the U.S. Patent and Trademark Office on May 1, 2000. Unsolicited newspaper reports of AMP's intention to launch a version of *Vogue* magazine for teenagers were published in the U.S. in early 2000. In September, 2000, AMP distributed approximately 1.4 million copies of the first issue of *Teen Vogue* via mail and to newsstands. Since its introduction, there has been widespread media coverage of *Teen Vogue* and the events surrounding its creation.

When AMP attempted to register the website teenvogue.com for its *Teen Vogue* magazine, it discovered that the domain name had recently been registered by defendant Fred Zito.[2] Since this domain name had already been registered, AMP added a link to *Teen Vogue* on its vogue.com home page. Mr. Zito registered the domain names teenvogue.net on January 4, 2000, and teenvogue.com on February 18, 2000, with the registrar Network Solu-

---

a preliminary injunction and the hearing (which defendant acknowledged receiving prior to the date of the hearing), defendants did not submit any opposition brief nor did defendants appear at the hearing.

**2.** Generally speaking, second level domain names (*e.g.* teenvogue) are registered by regis-

trars on a first come, first serve basis after payment of a small filing fee. Although there has been some movement through the World Intellectual Property Organization to establish an international arbitration procedure and rules for domain name registration, the rules have not yet been finally established.

tions, Inc. On February 14, 2000, Mr. Zito registered the domain name vogue-international.com with the registrar Register.com. At present, Defendants are making use of the teenvogue.com. and vogue-international.com domain names. Both domain names, along with the domain name www.business-items.com, connect to the same website, which is owned and operated by Mr. Zito. Mr. Zito's website includes links for purchasing cosmetics, hair accessories, specialty items, fashions, business accessories and travel accessories. In general, where the name "Vogue International" appears on the website, the word "Vogue" is displayed more prominently and in larger font than the word "International". By comparison to Vogue's website, defendants' teen-vogue.com/ vogue-international.com website is shoddily produced. The merchandise offered on defendants' website is "down market" and not comparable to the products featured and advertised in the *Vogue* and *Teen Vogue* magazines.

Plaintiff filed the instant action in late September. After being served with the Verified Complaint, Defendants filed an Answer with the Court on or about October 17, 2000. Attached to Defendants' Answer are three consumer letters sent via e-mail from three different readers of *Teen Vogue* commenting on the new magazine. Although these letters appear to be intended for *Teen Vogue* magazine, they were sent to the e-mail addresses provided on defendants' web site (webmaster@vogue-international.com and support@vogue-international.com).[3]

## II. STANDARD OF REVIEW: PRELIMINARY INJUNCTION

■ An injunction is an extraordinary remedy which should only be granted in limited circumstances. *AT&T v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1426–27 (3d Cir.1994). However, a preliminary injunction is appropriate where the moving party produces evidence to establish the following four factors: (1) the likelihood plaintiff will prevail on the merits; (2) the extent to which plaintiff is being irreparably harmed by the conduct at issue; (3) the extent to which the non-moving party will suffer harm if the injunction is granted and whether the balance of equities favors the plaintiff; and (4) the public interest. *Id.* at 1427; *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 191 (3d Cir.1990).[4]

## III. DISCUSSION

### A. Likelihood of Success on the Merits

AMP alleges that defendants use of the domain names teenvogue.com, teen-vogue.net and vogue-international.com, and the company name Vogue International constitutes trademark infringement, trademark dilution and unfair competition under the Lanham Act, 15 U.S.C. § 1114(1), § 1125(a), (b) and (c), a violation

---

3. It clearly appears that these consumers were seeking to correspond with AMP about *Teen Vogue* magazine; they accessed defendants' "teenvogue.com" website and found the e-mail addresses, and mistakenly sent their respective letters to defendants rather than *Teen Vogue*. (Bellando Decl. para. 9–10). It thus appears that these consumers were confused and misled into believing that the e-mail addresses provided on defendants' site would connect them with *Teen Vogue* magazine.

4. In the Third Circuit, preliminary injunctive relief may be granted where the above factors are met in trademark infringement cases. *See, e.g., Opticians Ass'n*, 920 F.2d at 198.

Although this Circuit has not yet published an opinion awarding preliminary injunctive relief for violations of the ACPA, other circuits have addressed the issue. *See, e.g., Sporty's Farm L.L.C. v. Sportsman's Market, Inc.*, 202 F.3d 489 (2nd Cir.2000), *cert. denied,* —— U.S. ——, 120 S.Ct. 2719, 147 L.Ed.2d 984 (2000). The ACPA expressly authorizes a Court to "order the forfeiture or cancellation of the domain name or the transfer of the domain name to the owner of the mark." 15 U.S.C. § 1125(d). Where the traditional standards are met, a preliminary injunction is a logical preliminary measure prior to cancellation or transfer.

of the ACPA, 15 U.S.C. § 1125(d), and unfair competition under New Jersey statutory law, N.J.S.A. 56:4–1 and common law. This Court has determined that defendants' actions constitute trademark infringement and unfair competition under the Lanham Act and a violation of the ACPA; it is unnecessary to reach plaintiff's other claims at this time.

### 1. The Lanham Act

"The law of trademark protects trademark owners in the exclusive use of their marks when use by another would be likely to cause confusion." *Interpace Corp. v. Lapp, Inc.* 721 F.2d 460, 462 (3d Cir.1983); *see also Fisons Horticulture, Inc. v. Vigoro Industries, Inc.,* 30 F.3d 466 (3d Cir. 1994); *Scott Paper Co. v. Scott's Liquid Gold, Inc.,* 589 F.2d 1225, 1228 (3d Cir. 1978). Trademark infringement claims under the Lanham Act, 15 U.S.C. § 1114(1)[5] and federal unfair competition claims under the Lanham Act, 15 U.S.C. § 1125(a)[6] are measured by identical standards. *A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.,* 237 F.3d 198, ——, 2000 WL 1763334, *11 (3d Cir.2000). To prevail on a claim under either 15 U.S.C. § 1114(1) or § 1125(a), a plaintiff must establish that: "(1) the mark is valid and legally protectable; (2) the mark is owned by the plaintiff; and (3) the defendant's use of the mark to identify goods or services is likely to create confusion concerning the origin of the goods or services." *Fisons Horticulture,* 30 F.3d at 472 (citing *Ford Motor Co. v. Summit Motor Products, Inc.,* 930 F.2d 277, 291 (3d Cir.1991)); *Express Services, Inc. v. Careers Express Staffing Services,* 176 F.3d 183, 185 (3d Cir.1999); *A&H Sportswear,* 237 F.3d at ——, 2000 WL 1763334 at *11.

The first two requirements, validity/legal protectability and ownership, are automatically proven when a mark is federally registered and has become "incontestible" under the Lanham Act, 15 U.S.C. § 1058 and 1065. *Fisons Horticulture,* 30 F.3d at 472 (citations omitted). The Vogue Trademarks are federally registered,[7] owned by AMP and are "incontestible" under 15 U.S.C. § 1065. (See Cmpl., Ex. 2). Although certain defenses exist to the validity of an incontestible mark, none have been raised here. In addition, this Court finds that the Vogue Trademarks are widely recognized by the purchasing public and are "inherently distinctive" and therefore valid and legally protectable. *See Fisons Horticulture,* 30 F.3d at 472 (citing *Ford Motor,* 930 F.2d. at 291).[8]

**5.** Section 32 of the Lanham Act, 15 U.S.C. § 1114(1) protects registered trademarks and provides in relevant part:
(1) Any person who shall, without the consent of the registrant,
(a) use in commerce any reproduction, counterfeit, copy or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution or advertising of any goods or services on or in connection with which such use is likely to cause confusion, ....
shall be liable in a civil action by the registrant for the remedies hereinafter provided.

**6.** Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), protects both registered and unregistered marks, and provides in relevant part:
(a)(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading representation of fact, which—
(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services or commercial activities by another person ...
shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act.

**7.** The Vogue Trademark registrations include Registration Nos. 1,336,659; 1,666,656; 69,530; 103,770; 504,006; and 1,659,761. These registrations date back as far as 1908.

**8.** Trademark law recognizes varying types of marks, generally grouped into four categories: (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary or fanciful. *A&H Sportswear,* 237 F.3d at ——, 2000 WL 1763334 at *31.

■ The use of a precisely similar name is not required for a finding of trademark infringement under Sections 32 and 43(a) of the Lanham Act. *Fisons Horticulture,* 30 F.3d at 477; *Jews for Jesus v. Brodsky,* 993 F.Supp. 282, 296 (D.N.J.1998). A name which is "confusingly similar" or a "colorable imitation" of the trademark is sufficient. "Marks are confusingly similar if ordinary consumers are likely to conclude that they share a 'common source, affiliation, connection or sponsorship.'" *Jews for Jesus,* 993 F.Supp. at 296 (citing *Fisons Horticulture,* 30 F.3d at 477). In this instance, since the names used by defendants actually incorporate the term "Vogue" which is a registered trademark of AMP, plaintiff has demonstrated a likelihood of success on the merits that such terms are both colorable imitations of, and confusingly similar to, the Vogue Trademarks.

■ The third requirement of trademark infringement under Sections 32 and 43(a) of the Lanham Act, 15 U.S.C. § 1114(1), 1125(a), is that the plaintiff demonstrate a "likelihood of confusion" by consumers. The Third Circuit in *Scott Paper Co.,* 589 F.2d at 1229, set forth ten factors to be considered in evaluating the likelihood of confusion by consumers:

(1) the degree of similarity between the owner's mark and the allegedly infringing mark;

(2) the strength of the owner's mark;

(3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;

(4) the length of time the defendant has used the mark without evidence of actual confusion arising;

(5) the intent of the defendant in adopting the mark;

(6) evidence of actual confusion;

(7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media;

(8) the extent to which the targets of the parties' sales efforts are the same;

(9) the relationship of the goods in the minds of the public because of the similarity of function; and

(10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market.[9]

*Scott Paper Co.,* 589 F.2d at 1229; *Interpace Corp.,* 721 F.2d at 462. Application of the above factors to the instant case demonstrates that plaintiffs are likely to succeed on the merits in demonstrating that defendants' use of "Teen Vogue" and "Vogue–International" is likely to cause confusion among consumers.[10]

Categories three and four are deemed "inherently distinctive." *Fisons Horticulture* 30 F.3d at 478. The "Vogue" mark is at least suggestive, and is more likely arbitrary. It is also a "strong" mark, as stated above, which entitles it to greater protection. *A&H Sportswear,* 237 F.3d at —— ——, 2000 WL 1763334 at *32–33.

9. In this Opinion, these 10 factors may often be referred to as the *"Lapp"* factors.

10. Until recently, the *Lapp* factors were generally only applied in cases of non-competing products. In *Interpace Corp.,* the Third Circuit had stated "Where the trademark owner and the alleged infringer deal in competing goods or services, the court need rarely look beyond the mark itself. In those cases the court will generally examine the registered mark, determine whether it is inherently distinctive or has acquired sufficient secondary meaning to make it distinctive, and compare it against the challenged mark." *Interpace Corp.,* 721 F.2d at 462. However, the Third Circuit recently clarified that the *Lapp* factors generally also should be used by district courts to determine whether a likelihood of confusion exists in cases of competing goods or services as well, other than in the rather rare circumstance where the marks are "clearly very similar". *A&H Sportswear,* 237 F.3d at ——, 2000 WL 1763334 at *19. To a certain extent, AMP and defendants do deal in competing goods and services—the sale of fashion and related products over the internet. However, it appears that the primary purpose of AMP in using the Vogue Trade-

**(1)** *Similarity of the Trademarks.*

The company name and domain names used by defendants each contain the term "Vogue" which is a registered trademark, and which is also the key identifying factor in all of the Vogue Trademarks. The strong similarity between the names is therefore evident. "Where an infringer uses the exact mark of the holder of a mark, a great likelihood of confusion exists." *Jews for Jesus*, 993 F.Supp. at 302 (citations omitted). In addition, AMP and defendants operate in the same general industry—fashion—making the similarity of the names more confusing to consumers.

**(2)** *Strength of the Mark.*

The strength of the mark is often measured by "(1) the distinctiveness or conceptual strength of the mark and (2) the commercial strength of marketplace recognition of the mark." *A&H Sportswear*, 237 F.3d at ——, 2000 WL 1763334 at *31 (citations omitted). As stated above, plaintiffs will likely succeed in proving that the Vogue Trademarks are inherently distinctive and that the strength of the trademark is unquestionable. The Vogue Trademarks, and in particular the term "Vogue," have been used extensively by AMP for over 100 years to identify *Vogue* magazine and the publications associated with it. AMP spends millions of dollars annually to advertise and promote *Vogue* magazine, and buyer association of the name with the magazine is strong. Based on these first two factors alone, plaintiff is likely to succeed in proving a likelihood of confusion between the Vogue Trademarks and defendants use of the terms "Teen Vogue" and "Vogue International".

**(3)** *Sophistication of the Purchasers.*

The potential pool of consumers who may be confused by defendants' use of

the names in question is vast; it includes purchasers (and potential purchasers) of fashion items via the Internet, and fashion magazine consumers and readers. This Court has already noted that many Internet consumers are not particularly sophisticated, especially given the relatively recent expansion of the Internet into everyday society. *Jews for Jesus*, 993 F.Supp. at 303–304. This factor, therefore, also favors plaintiff.

**(4) and (6)** *Evidence of · Actual Confusion.*

As demonstrated by the letters sent via e-mail to defendants, evidence of actual confusion has already occurred, less than one year after defendants' web site was launched.

**(5)** *Defendants' Intent.*

Plaintiff submitted evidence of a conversation between a private investigator hired by plaintiff and Mr. Zito, in which Mr. Zito claimed to have been in the fashion industry for a long time, and that he was aware of the "power" of the Vogue name. (Woods Decl. at 2). At its most benign, this evidences defendants' awareness of the likelihood of confusion; it may also evidence intentional copying.

**(7), (8), and (9)** *Similarity of the Goods, Customers, etc.*

Both AMP and defendants are in the fashion industry, and there is significant overlap in their target markets and channels of trade. A strong likelihood of confusion exists when the goods and services fall within the same industry or class. *Opticians Ass'n*, 920 F.2d at 195.

This Court finds that the *Lapp* factors favor AMP in finding a likelihood of confusion,[11] and furthermore finds that plaintiff

marks is to sell magazines, which is not directly the business of defendants. Since the goods in question are, for the most part, not directly competing, and given the Third Circuit's new guidance in *A&H Sportswear*, this

Court also looks to the *Lapp* factors to determine a likelihood of confusion. *Id.*

**11.** The Third Circuit noted in *Fisons Horticulture:* "The weight given to each factor in the

has demonstrated a substantial likelihood of success on the merits under the Lanham Act, 15 U.S.C. § 1114($l$), § 1125(a).

### 2. The Anticybersquatting Consumer Protection Act

In 1999, Congress enacted the Anticybersquatting Consumer Protection Act (the "ACPA"), Pub.L. No. 106–113 (1999), codified at 15 U.S.C. § 1125(d). Congress passed the law to overcome the "increasing[ ] sophistication" of cybersquatters who "now take the necessary precautions to insulate themselves from liability" under the Lanham Act and to overcome the "uncertainty as to the trademark law's application to the Internet [which] has produced inconsistent judicial decisions and created extensive monitoring obligations, unnecessary legal costs, and uncertainty for consumers and trademark owners alike." S.Rep. No. 106–140 at 7; *see also Sporty's Farm*, 202 F.3d at 495–496. The ACPA has created a statutory remedy for trademark violations in the registration, trafficking, or use of a domain name.

Plaintiff argues that defendants' use of the domain names "teenvogue.com," "teenvogue.net" and "vogue-international.com" violates the ACPA.[12] As more fully set forth below, this Court finds a substantial likelihood of success on the merits with respect to this claim.

The ACPA provides in relevant part:

A person shall be liable in a civil action by the owner of a mark ... if, without

regard to the goods or services of the parties, that person—

(i) has a bad faith intent to profit from that mark ...; and

(ii) registers, traffics in, or uses a domain name that—

(I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark; [or]

(II) in the case of a famous mark that is famous at the time of registration of the domain name, is identical or confusingly similar to or dilutive of that mark[.]

15 U.S.C. § 1125(d).

Under the ACPA, plaintiff must prove a likelihood of success on three elements for the issuance of a preliminary injunction: (1) the mark must be "distinctive" or "famous" and thus entitled to protection; (2) the allegedly infringing domain names must be "identical or confusingly similar"; and (3) defendants must have had a bad-faith intent to profit from plaintiff's trademarks. *See Shields v. Zuccarini*, 89 F.Supp.2d 634, 638 (E.D.Pa.2000).

 The first prong of the test under the ACPA is easily satisfied here. For many of the same reasons cited in Part III.A.1 above, this Court finds that the Vogue Trademarks are highly distinctive. Although the ACPA does not set forth a definition for "distinctive" or "famous" it is appropriate to apply the definitions set forth in 15 U.S.C. § 1125(c)[13] to the

---

overall picture, as well as its weighting for plaintiff or defendant, must be done on an individual fact-specific basis.... We have emphasized the importance of similarity of the marks in likelihood of confusion, *Ford Motor Co.*, 930 F.2d at 293, but we have not ranked the factors otherwise." 30 F.3d at 476, n. 11.

**12.** A violation of the ACPA would not entitle plaintiff to an injunction against defendant's use of the terms "Teen Vogue" and "Vogue-International" outside registration, traffic or use of a domain name. Arguably, an injunction issued under Section 32 of the Lanham Act, 15 U.S.C. § 1114, would cover use of these domain names. However, since Congress specifically enacted the ACPA in order

to "provide clarity in the law for trademark owners by prohibiting the bad-faith and abusive registration of distinctive marks as Internet domain names," as noted above, the ACPA will be applied to the alleged domain name violations in addition to the Lanham Act. S.Rep. No. 106–140, at 4.

**13.** 15 U.S.C. § 1125(c) provides in relevant part: "Remedies for dilution of famous marks.

(1) ... In determining whether a mark is distinctive and famous, a court may consider factors such as, but not limited to—
(A) the degree of inherent or acquired distinctiveness of the mark;

ACPA. *Electronics Boutique Holdings Corp. v. Zuccarini,* 2000 WL 1622760 at 3, 4 (E.D.Pa. Oct.30, 2000) (applying factors set forth in 15 U.S.C. § 1125(c) to determine if a mark was distinctive and famous under the ACPA, 15 U.S.C. § 1125(d)). The Vogue Trademarks, and in particular the term "Vogue" as applied to fashion, has been used by AMP for over a hundred years and are registered trademarks of AMP. AMP has spent tens of millions of dollars in that time period promoting and advertising *Vogue,* and the Vogue Trademarks widely known and recognizable to consumers both in the U.S. and internationally. This Court finds as a matter of law that the Vogue Trademarks are both highly distinctive and famous.[14]

Plaintiffs have also demonstrated a substantial likelihood of success in proving the second prong of the test set forth in the ACPA, that the Vogue Trademarks and the domain names used by defendants are "confusingly similar." This Court held in Part III.A.1 above that plaintiff has shown a substantial likelihood of success on the merits in proving that the names "Teen Vogue" and "Vogue–International" are confusingly similar to the Vogue Trademarks. Although the ACPA language is not precisely identical to the Lanham Act language requiring a finding of a "likelihood of confusion," this Court finds that many of the *Lapp* factors are also appropriate indicia of "confusingly similar" marks in the ACPA context of domain names. *See* Part III.A.1.

In determining whether a person has a bad faith intent to profit from the mark, the ACPA lists nine non-exclusive factors that a Court may consider in making such determination. Courts are not limited to consideration of the above factors only, but may consider any other elements of bad faith. 15 U.S.C. § 1125(d); *Sporty's Farm,* 202 F.3d at 498. The listed factors are:

(I) the trademark or other intellectual property rights of the person, if any, in the domain name;

(II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;

(III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;

(IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;

(V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

(VI) the person's offer to transfer, sell, or otherwise assign the domain name to

(B) the duration and extent of use of the mark in connection with the goods or services with which the mark is used;
(C) the duration and extent of advertising and publicity of the mark;
(D) the geographical extent of the trading area in which the mark is used;
(E) the channels of trade for the goods or services with which the mark is used;
(F) the degree of recognition of the mark in the trading areas and channels of trade used by the marks' owner and the person against whom the injunction is sought;
(G) the nature and extent of use of the same or similar marks by third parties; and

(H) whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register."

**14.** *Sporty's Farm* gives an excellent summary of the difference between "distinctive" and "famous." "Distinctiveness refers to inherent qualities of a mark and is a completely different concept from fame. A mark may be distinctive before it has been used—when fame is nonexistent. By the same token, even a famous mark may be so ordinary, or descriptive as to be notable for its lack of distinctiveness." *Sporty's Farm* 202 F.3d at 497 (citations omitted).

the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the persons prior conduct indicating a pattern of such conduct;

(VII) the persons's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

(VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to goods or services of the parties; and

(IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c)(1) of this section.

15 U.S.C. § 1125(d)(1)(B)(i).

Applying these factors, this Court finds sufficient evidence of the bad faith intent of defendants to find that plaintiffs have shown a substantial likelihood of success on the merits under the ACPA. First, defendants had no intellectual property rights in the domain names "teenvogue.com", "teenvogue.net" and "vogue-international.com" prior to registering them. 15 U.S.C. § 1125(d)(1)(B)(i)(I). AMP had been using the Vogue Trademarks, which are registered, for over 100 years. Since Mr. Zito worked in the fashion industry, defendants could not possibly claim that they were unaware of the Vogue name and prominence. Second, the domain names in question are not Mr. Zito's personal name, and to the extent that such domain names refer to the legal name of his business, plaintiff has demonstrated a substantial likelihood of success in proving that name itself infringes the Vogue Trademarks, as this Court held in Part III.A.1. 15 U.S.C. § 1125(d)(1)(B)(i)(II). Third, defendants' intent to divert consumers from AMP's website may be inferred from Mr. Zito's admissions to AMP's investigator about capitalizing on the fame of *Vogue* magazine. 15 U.S.C. § 1125(d)(1)(B)(i)(V). Fourth, as stated above, the Vogue Trademarks, and the Vogue name in particular, are both "distinctive" and "famous." 15 U.S.C. § 1125(d)(1)(B)(i)(IX). Fifth, defendants cannot claim that their use of the three domain names was "noncommercial" or a "fair" use. 15 U.S.C. § 1125(d)(1)(B)(i)(IV).

Plaintiff also argues that defendants' bad faith is demonstrated by the "unique circumstances of this case, which do not fit neatly into the specific factors enumerated by Congress but may nevertheless be considered under the statute." *Sporty's Farm*, 202 F.3d at 499. Plaintiff avers that Mr. Zito's admissions to AMP's investigator that (1) he was aware of the prominence of *Vogue* magazine when he registered the domain names; (2) when people heard the "teenvogue.com" domain name they "automatically" thought is was an offshoot of *Vogue* magazine; and (3) he (and others) considered the domain names "powerful" because of *Vogue's* prominence, viewed together with the fact that defendants set up a website that offers fashion items and cosmetics, lead inexorably to the conclusion that defendants registered these domain names with a "bad faith intent to profit." [15] This Court agrees, and

---

15. The ACPA also contains a "safe harbor" from a determination of bad faith intent. 15 U.S.C. § 1125(d)(1)(B)(ii) provides "Bad faith intent described under subparagraph (A) shall not be found in any case in which the court determines that the person believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful." However, there is no evidence presently before the Court which suggests that

finds that these factors quite amply demonstrate a substantial likelihood of success in proving defendants' bad faith intent.

This Court thus concludes that plaintiff has demonstrated a substantial likelihood of success on the merits that (1) defendants' use of the names teenvogue.net, teenvogue.com, and vogue-international.com violate the ACPA and (2) defendant's use of those names, along with the company name Vogue International, violates Sections 32 and 43 of the Lanham Act.

### B. Irreparable Harm to Plaintiff

■ Irreparable harm "must be of a particular nature, so that compensation in money alone cannot atone for it." *Morton v. Beyer* 822 F.2d 364, 372 (3d Cir.1987) (citations omitted). In a trademark infringement case such as this, proof of a likelihood of confusion is sufficient to demonstrate irreparable harm. *Opticians Ass'n,* 920 F.2d at 196–197 ("since we have already held that the concurrent use of [the trademarked name and the infringing mark] creates the likelihood of confusion, the inescapable conclusion is that there is also irreparable injury").[16]

In addition, plaintiff has demonstrated specific irreparable harm stemming from the use of the company name and domain names in question by defendants. First, the Managing Editor of Vogue testified that letters and e-mails from consumers are a valuable source of information to AMP in planning future issues and the future course of the magazines. Since defendants' Answer included direct evidence

that some consumers were sending information to defendants in an apparent attempt to communicate with *Teen Vogue* magazine, it is clear that AMP is harmed because it is not receiving consumer information from which it would benefit. A more significant harm is the damage to AMP's reputation resulting from defendants' activities. The quality of defendants' website and the type of the goods offered for sale by defendants are not comparable to the quality of AMP's website and the quality of goods featured in *Vogue* and *Teen Vogue* magazine, as well as the goods sold on AMP's vogue.com website (through an affiliation with Nieman Marcus). AMP's solid reputation in the fashion industry with both advertisers and consumers and the good-will it has generated will be damaged if such consumers and advertisers associate defendants' website and products with AMP. In addition, irreparable harm may occur to plaintiff because plaintiff will be unable to control the communications from defendants to consumers who believe they are communicating with AMP.

### C. Harm to Defendants/ Balance of the Hardships

■ Generally speaking, where bad faith of a defendant in a trademark infringement case has been clearly demonstrated, the balance of equities will not favor defendant. *See, e.g., S & R Corp. v. Jiffy Lube Intern., Inc.,* 968 F.2d 371, 379 (3d Cir.1992); *Opticians Ass'n,* 920 F.2d at 196; *Jews for Jesus,* 993 F.Supp. at 312. The Court assumes that defendants' business might be harmed by loss of the names

---

defendants actually believed, or had reasonably grounds to believe, the use of these names was lawful. On the contrary, plaintiff's witness testified and submitted an affidavit stating that during his conversations with defendant Mr. Zito, Mr. Zito stated that when people hear the name Teen Vogue they "automatically draw to it because they're going to—automatically think it's the magazine and they're going to think its probably that they came out with a teen magazine." (Woods Decl. at 2).

**16.** The logic set forth by the Third Circuit in *Opticians Ass'n,* 920 F.2d at 196–197, which found that irreparable harm automatically followed from likelihood of confusion (based on damages to reputation, loss of goodwill etc.) also applies to find irreparable harm automatically following from a finding that such names are "confusingly similar" under the ACPA. At least one other district court in this Circuit has reached the same conclusion. *Shields,* 89 F.Supp.2d at 641.

which incorporate the "Vogue" trademark. However, any potential harm is mitigated by several factors. First, "having adopted [a trademark which causes confusion, defendant] cannot now complain that having to mend its ways will be too expensive." *Opticians Ass'n*, 920 F.2d at 197 (citations omitted). To the extent that the potential harm to defendants is directly related to the fact that the use of the "Vogue" trademarks is likely to confuse consumers into thinking defendants' business is affiliated with the *Vogue* magazines, defendants should not be entitled to complain about such harm. Moreover, defendants have only been using the domain names and the company name for less than one year, compared with AMP's use of the term Vogue for over 100 years. Any potential harm is mitigated by the fact that defendants can continue to operate their website under their third existing domain name which already links directly to their website (www.business-items.com). Finally, the strong showing of irreparable injury to plaintiff clearly outweighs any potential harm to defendants and thus tips the equities in its favor.

### D. The Public Interest

 Once the likelihood of success on the merits and irreparable injury to plaintiff have been amply demonstrated, as they have here, "it will almost always be the case that the public interest will favor" injunctive relief. *Jews for Jesus*, 993 F.Supp. at 312; *AT&T*, 42 F.3d at 1427 n. 8. In addition, the prong of the test requiring plaintiff to demonstrate that the public interest favors injunctive relief is "most often a synonym for the right of the public not to be deceived or confused." *Opticians Ass'n*, 920 F.2d at 197. As noted above, there is ample evidence of actual confusion among consumers, and further evidence that the consuming public will likely continue to be confused by defendants' use of the company name and domain names Teen Vogue and Vogue International. The issuance of an injunction in this case will protect the public from this

deceptive and confusing use of the names Teen Vogue and Vogue International, and an injunction is therefore in the public interest.

### IV. CONCLUSION

For the reasons stated above, plaintiff's motion for a preliminary injunction is hereby granted, and defendants are enjoined from maintaining, transferring or using the domain names teenvogue.com, teenvogue.net and vogue-international.com, and the company name Vogue International, or any other names confusingly similar to such terms. An appropriate order will issue.